(43 P.3d 855)

No. 85,309

No. 85,445

STATE OF KANSAS, *Appellee/Cross-appellant*, v. ARTIS TERMAIN COBB, *Appellant/Cross-appellee*.

Opinion
filed April 12, 2002.

*Reid T. Nelson*, assistant appellate defender, *Steven R. Zinn*, deputy appellate defender, and *Jessica R. Kunen*, chief appellate defender, for appellant/cross-appellee.

*Chris Biggs*, county attorney, and *Carla J. Stovall*, attorney general, for appellee/cross-appellant.

Before BEIER, P.J., PIERRON, J., and WAHL, S.J.

BEIER, J.: Artis Cobb appeals his jury trial convictions of voluntary manslaughter and involuntary manslaughter in the deaths of Kasey Blount and her infant daughter, Alannah. He raises five issues: (1) The district court should have suppressed his statements to the police as involuntary and made in violation of his right to counsel; (2) the district court erroneously allowed a witness to testify that the death of Alannah was a homicide; (3) the district court erroneously prevented a defense expert from testifying about inconsistencies between Cobb's confession and the crime scene; (4) the evidence was insufficient to support a voluntary manslaughter conviction; and (5) testimony that he had admitted to choking a

woman should not have been admitted. The State raises two issues on cross-appeal: (1) The district court erroneously permitted an expert witness to testify regarding the phenomenon of false confessions; and (2) the district court erroneously gave a special confession instruction.

## Factual Background

The number and complexity of the issues in this case, including at least two of first impression, demand a thorough recitation of the facts.

### The Crimes

Kasey Blount was found dead in her apartment in Junction City by her husband when he returned home from military exercises. Her decomposing body was on its back on the living room floor, naked below the waist. Kasey had a baby's sock in her throat and a pillow under her leg. A cushion was off of the nearby loveseat, and a knife was on the floor. An autopsy determined that Kasey had been asphyxiated.

Alannah's body was in an upstairs crib. She died of dehydration, apparently after her dead mother could no longer respond to quench her thirst.

Physical evidence at the crime scene included semen from Keith Jones, semen from Javis Devore, and a fingerprint from James Battle. All three men admitted to having sex with Kasey in her apartment during her husband's absence. Jones eventually directed the attention of authorities to "Scoop," whom he later identified as Cobb. No physical evidence ever tied Cobb to the crime scene.

### The Interrogations

In August 1997, approximately 3 years after the crime was discovered, Special Investigator Raymond Lundin of the Kansas Bureau of Investigation (KBI) and Special Agent Larry Thomas, Chief of the Cold Case Squad for the KBI, interrogated Cobb while he was in jail in Georgia on an unrelated drug charge. At the beginning of the interview, Lundin read Cobb his *Miranda* rights, and Cobb agreed to speak with the agents.

The interview lasted from 10 a.m. to 5:30 p.m., although several breaks were taken. Cobb was permitted to smoke outside, and he was provided with sandwiches for lunch. Thomas testified that at no time during the interview did either he or Lundin speak harshly or act in any other aggressive or threatening manner.

During the interview, Cobb told Lundin he had found Jesus and had been studying religious literature. Cobb held a religious book during the interview and at one point got on his knees and appeared to pray. Lundin testified that he and Thomas did not discuss the specifics of the crime scene with Cobb, but they did show him a reward poster stating Kasey's cause of death as suffocation.

Initially, Cobb denied knowing Kasey or being in Junction City, but he then said he had seen her at the barracks and had been in Junction City. He made no incriminating statements about participating in raping or killing Kasey until after Lundin told him that Jones' testimony would "bury him." After this, Cobb remained quiet with his head down, and Lundin began to introduce scenarios of how the homicide might have happened, including a suggestion that it might have been part of a gang initiation.

Cobb then told the agents that he participated in an initiation process of a group of soldiers called "the Pimps" who lived at the barracks. He explained that he had to drink a concoction made of grenadine, nitrane, and other alcohol called "blood" and then answer questions. He was then taken by Andrew Jones to Kasey's apartment. He said Andrew Jones forced Kasey to undress and forced Cobb to have sexual intercourse with her. Afterward, Cobb said, Andrew Jones directed Cobb to hold Kasey's arms while Andrew Jones held a pillow over her face until she stopped moving. Andrew Jones then told Cobb to wait for him in the car. When Andrew Jones joined Cobb a few minutes later, he said the initiation was complete and, "Now you a pimp, nigger."

Cobb drew a diagram of the basic layout of the crime scene, locating the furniture in the room and the body. He also wrote a poem for Kasey's mother. Near the end of the interview, Cobb wrote a four-page statement describing his involvement. At Lundin's suggestion, Cobb included a statement that "Agent Lundin of the Kansas Bureau of Investigation has advised me of all my

rights and I am providing the following information voluntarily." The agents then reviewed the statement with Cobb, and the interview concluded.

When the agents returned to interview Cobb a couple of days later, Cobb handed them a letter, which stated:

" 'After speaking with various family members, I've come to a couple of conclusions; One being, I made a very detrimental mistake by taking the actions I took with you two agents . . . . I'm referring to my writing the statement, which could very well be "self-incriminating."

Due to the fact that I feel as though I was coerced into writing the statement, I wish to withdraw it in its entirety.

Out of extreme fear and lack of understanding, I created a scenario in my mind, in order to satisfy the two (2) agents, and I placed it on paper. It has no meaning nor is any of it true.

Please disregard the entire contents of the statement.

Anything to be discussed in future situations has to be done in the presence of my attorney.

Thanks for your time. Respectfully, Artis T. Cobb.' "

After the agents read the letter, Cobb said he wanted to explain it. Lundin again recited Cobb's *Miranda* rights, and Cobb signed a written waiver of his rights and agreed to speak with the agents. Cobb explained that he did not want to withdraw the part of the statement about knowing Kasey; he just wanted to withdraw the part about raping and murdering her. He then agreed to look at photographs of Andrew Jones and Keith Jones. Cobb identified Andrew Jones; although he could not name Keith Jones, he recognized him as someone he had seen around Junction City. At no time during this meeting with Lundin and Thomas did Cobb assert his right to remain silent or make reference to wanting counsel.

Two more years passed before Lundin contacted Bill Pfeil of the Florida Department of Law Enforcement and asked for help with the investigation of Cobb. Cobb was informed that agents wanted to meet with him, and Cobb came in to meet with Pfeil and Lundin in July 1999.

At the beginning of this interview, Cobb said he went by the nickname "Scooby." Pfeil then advised Cobb of his *Miranda* rights, and Cobb indicated he understood them. When asked if he was

willing to talk about Kasey, Cobb responded: "Yeah, I'll talk to you about it, you know that."

Pfeil lied to Cobb, telling him there was new technology that had provided Kansas with evidence placing him at the crime scene "hook, line, and sinker." Pfeil repeated similar comments throughout the interview. Cobb stated several times that he could not remember being at Kasey's apartment. After one such statement, the following exchange took place between Cobb and Pfeil:

"Q. Well, if these guys arrest you for this is it going to, is it going to jog your memory?
"A. I don't know.
"Q. Or what?
"A. I don't know. I mean, I told those guys right then and there, you know: Are you guys going to arrest me or anything? You know what I'm saying.
"Q. That's all in due time.
"A. Well, I mean, I don't remember anything about this situation. And if due time ain't today, then I would rather have a lawyer here present with me for the rest of this, okay?
"Q. Give me a minute here.
"A. So you are going to arrest me today for it, huh?
"Q. Probably so.
(WHEREUPON, Mr. [Pfeil's] departure was noted for the record.)
"A. Look, man —
"Q. (By Mr. [Pfeil]) Probably so.
"A. — let's talk some more, please, for me, because I, I can't deal with it —
  (WHEREUPON, Mr. [Pfeil's] presence was noted by the reporter.)
"A. — I truly can't.
"Q. (By Mr. [Pfeil]) Okay, Artis, what I have got here is an arrest warrant from the State of Kansas. It's charging you with six counts.
"A. Six counts of what?
"Q. Six counts.
(WHEREUPON, Mr. [Pfeil's] departure was noted by the reporter.)
"A. No, no. We can talk some more, please. Let's talk some more. Let me try to remember some of this, I mean."

Lundin entered the room and said: "Now, I was listening outside the door and I heard you say, you know, you don't want to talk no more about this thing, that you wanted a lawyer. Would you like to talk some more about this with us?" Cobb responded: "We can talk some more about this. Let's do."

During the ensuing interrogation by Lundin, both Lundin and Cobb made numerous religious references. In essence, they took turns in propelling the dialogue forward in this manner. For example, Lundin led the following exchange:

"Q.   Do you think the Lord hears?
"A.   Oh, yeah.
"Q.   Do you think he's listening now?
"A.   Yeah.
"Q.   And would the Lord prefer that we spoke the truth or that we spoke lies?
"A.   We spoke the truth, always.
"Q.   Do you think he's pleased with what he's hearing from your mouth right now?
. . . .
"Q.   . . . And the Lord don't want no half-baked Christians. He don't want no half-born — and he's not responsible for lies.
"A.   That's true.
"Q.   He'll give us the truth. We are the ones that provide the lies. That's where we are, that's where we went wrong long, long, long ago and I know it hurts to bring this out, but I think I know in your heart you want to tell me the truth so bad that it's just . . . ."

At other times, Cobb took the lead in invoking religious themes.

"A.   I had no reason to listen to what they was speaking and I look at them as though it was the devil, you know, trying to make a bargain with me. But I got news for them, they can't have this life, they can't have this soul because I'm planted now. I'm planted, ain't going to and I know that He's going to see me through this.
"Q.   ˙Okay. That's where your trust should be.
"A.   That's where all of my trust is.
"Q.   You know what they say— (Tape Inaudible.)
"A.   And one of my favorite little passages is that He would never put a burden on you that you can't bear. He'll never give you a load— it's not a load for me because I'm not carrying it by myself. I'm depending on Him to help me carry this. If He don't want my help I'll let Him carry it his own self because I have that much trust in Him and I know that something good is going to come out of this. I know that something good is going to come out of this.
"Q.   In and—
"A.   The Lord loves me and I love him too so that's where all of my trust is. I mean, I didn't mean to back out of that statement but I only backed out of that statement because I was surrounded by nothing but evil in that jailhouse."

Cobb eventually admitted to drinking until he was intoxicated with other members of the Pimps, including Andrew Jones. Cobb

drove to Kasey's apartment with Andrew Jones, and he sat downstairs and drank while Andrew Jones went upstairs with Kasey for 5 or 10 minutes.

When Andrew Jones and Kasey came downstairs, she looked upset. According to Cobb, Andrew Jones told her that now she was "gonna give my boy some of this," meaning that she was going to have intercourse with Cobb. When she resisted, Andrew Jones grabbed her and held her down to the floor and told Cobb to have sex with her or he would kill him. Cobb complied.

Finally, when Lundin asked Cobb how Kasey died, Cobb responded: "Ms. Kasey died with a pillow over her face, a pillow that was held by me, but I never meant to do it." Cobb denied knowing Alannah was upstairs at the time of her mother's death.

## The Pretrial Motions

Before trial, Cobb moved to suppress his statements from his interviews as the products of coercive and deceptive practices by the agents and of violations of his right to counsel. The district court conducted a hearing on the motion and ultimately rejected Cobb's arguments.

Specifically, regarding the August 1997 statements, the district court found Cobb had made the statements voluntarily and with full knowledge of his *Miranda* rights. The court also found Cobb reinitiated communication with the agents after giving them the letter withdrawing his earlier statement and requesting counsel, and he voluntarily waived his right to counsel orally and in writing by waiving his *Miranda* rights again.

Regarding the July 1999 statements, the district court found that Cobb made an ambiguous request for counsel that did not require follow-up questioning by the agents. Cobb also reinitiated communication by asking if he was going to be arrested, he begged the officers to continue to speak with him, and Lundin clarified the ambiguous statement by asking Cobb if he wanted to continue to speak with them even though he had said he wanted a lawyer. The court also found the July 1999 statements were voluntary under the totality of the circumstances, in spite of the interrogation's heavy emphasis on religion and redemption. According to the

court, Cobb was not suffering from any mental condition that impaired his ability to understand what was happening, and the manner and duration of the interrogation was not unduly restrictive. Cobb never requested communication with the outside world, he was an adult male of average intellect who had been in the army and had dealt with the criminal system before, and the officers were fair in conducting the investigation. The agents' untruthful statements about nonexistent DNA evidence and incriminating evidence from other persons were merely "bluff" and did not render Cobb's statements involuntary, the court concluded.

The State filed a pretrial motion in limine to prevent the defense from using expert testimony regarding the tendency of certain police interrogation techniques to produce false confessions. At the hearing on the motion, Dr. Richard Leo testified about his expertise in criminology and social psychology and his specialty in police investigative behavior and "extreme influence in decision making." Leo said he had participated in five or six police interrogation training seminars, including classes by Reid and Associates; he had taught police officers interrogation methods; he had written several articles in the field; and he was on the editorial board of the Law and Society Review. In his opinion, he said, he and Dr. Richard Ofshe are considered leading authorities in the field of police interrogation.

Leo also testified about the acceptance of "extreme influence in decision making" as a legitimate field of study. He said it had been recognized since 1908, and several indicators showed its acceptance level, including the amount of reputable research in academic journals, the presence of high-level textbooks or encyclopedias about the field, and the institutionalization of the area of study in university settings. Leo further explained that no dispute existed in the academic literature or among police about the existence of false confessions but that the subject was outside common experience or common knowledge of laypersons.

Leo also testified that research has shown certain techniques of investigation are more likely to produce a false confession than other techniques. For example, techniques that maximize the suspect's involvement in the crime, suggesting that a failure to confess

will cause him or her to be seen in a worse light and lead to maximum punishment, can produce false confessions. Minimization, a technique in which the questioner suggests to the suspect that the suspect had a lower level of culpability, perhaps because of self defense or a mistake, can also have that effect, he said, as can exhaustion, sleep deprivation, and extended questioning. Leo admitted on cross-examination that there are no statistics showing how often false confessions actually occur.

The district court ruled that Leo could not testify at trial regarding voluntariness, as that issue had already been disposed of. He could, however, testify about the phenomenon of false confessions and the correlation between them and certain interrogation techniques.

The Trial

At trial, Leo testified that the police in this case used Reid and Associates techniques in interrogating Cobb—such as telling him they knew he committed the crime, confronting him with irrefutable evidence of his guilt, suggesting that they wanted to help him, suggesting the gang initiation scenario, appealing to Cobb's moral and religious sense, using maximization and minimization, leading him to believe that they would meet with the district attorney, and repeatedly asking Cobb to remember what happened and to help himself out. Leo explained that some of the techniques used by the interrogators in this case have contributed to false confessions.

Dr. Erik Krag Mitchell, who performed the autopsies on the victims, testified Kasey died of asphyxiation because the sock lodged in her throat obstructed her airway. Although she did not have bruising on her arms, Mitchell noted bruising on her upper chest and her neck, which probably was caused by manual strangulation. Mitchell also had been asked after the autopsy to examine photographs of the crime scene. At that time he noticed a pattern injury to Kasey's face and neck, which was consistent with a textile having a matching pattern being pressed against those parts of her body.

During the prosecutor's examination of Mitchell about Alannah's death, the following exchange occurred:

"Q. Were you able to reach any conclusions on what the manner of death in this particular case was for this child, based on your examination?
"A. Yes.
"Q. Okay. And what was that?
"A. This is a homicide.
"Q. And what do you mean by that, Doctor?
"A. This means that this child has died as a result of the actions of another person or persons. This child was in a crib. It was of an age where it could not, itself, obtain help or maintain itself. It was not cared for because the mother was dead, because someone else had killed the mother; and, this makes it a homicide."

Defense counsel did not object to this testimony.

Kelly Robbins, a KBI forensic scientist, testified about the absence of DNA evidence implicating Cobb. Robbins said it was possible for a sexual assault to leave no evidence of the perpetrator's bodily fluids. A negative rape kit can result, she said, if there was no penetration, there was penetration without ejaculation, there was penetration with only a small amount of ejaculate, the ejaculation took place outside the victim's body in an unidentified location, semen was not collected as part of the kit, or the semen deteriorated before testing was performed.

Chandra Scott, a friend of Cobb's, testified that Cobb came to her home around the time of the crimes to talk to her. He was upset and said he was seeing a woman married to a man in the military who had a baby girl. According to Cobb, he and this woman "got into it" and he choked her. Scott admitted she and Cobb were smoking marijuana during this conversation. She also recalled that she had dropped Cobb off at Kasey's apartment complex on one occasion so that he could visit his girlfriend.

Cobb's jury also heard from Brent Turvey, a private forensic scientist and recognized expert in crime scene analysis hired by the defense. Turvey said he received and reviewed over a hundred reports and documents relevant to the case. He also had visited the exterior of the crime scene the night before he took the stand, walking around the apartment complex. Turvey explained that he had been retained to compare the physical evidence at the crime scene to the content of the statements Cobb made to investigators.

When defense counsel asked what conclusions Turvey had reached, the prosecutor objected on the ground that the testimony

would invade the province of the jury and that it lacked foundation. Outside the presence of the jury, defense counsel proffered a report compiled by Turvey that highlighted 12 discrepancies between the forensic evidence and Cobb's statements. Defense counsel argued:

"Judge, I don't think Mr. Turvey's [testimony] goes to the ultimate issue here either. He's not going to say whether Mr. Cobb is guilty or not guilty, he's not going to say whether the confession was false or true, he's going to say whether the crime scene evidence is consistent or inconsistent with the statement."

The district court ruled:

"Every one of these findings ha[s] already been in evidence through other witnesses, as far as the Court can find or recalls. And the — these are arguments to the jury, and the Court doesn't believe that any of these would materially aid the jury in their determination of guilt or innocence in this case."

Defense counsel then asked the district judge if Turvey could testify about evidence indicating Kasey had been dragged, and the proffer continued. It included Turvey's anticipated testimony that the absence of Cobb's semen, sperm, or fingerprints at the crime scene weighed against guilt. In addition, Turvey would have testified the lack of injury to Kasey's arms was inconsistent with Cobb's story that she was a struggling victim restrained by two offenders, the presence of a pubic hair in the sock in Kasey's throat could have been transferred from a public laundry, and the physical evidence conflicted with Cobb's story that Kasey had been suffocated with a pillow.

Turvey admitted that he could not say positively whether Cobb was present at the crime scene and that he did not personally examine the physical evidence.

The district court then reiterated its decision not to allow Turvey to testify because (a) his testimony would not materially aid the jury, (2) he had not examined any of the evidence in the case personally, (3) the jury was already well aware that no evidence at the crime scene implicated Cobb, and (4) the evidence about dragging of Kasey had not been included in Turvey's earlier written report and the State was therefore unprepared to respond to it.

## The Instructions

The district court gave the following instruction regarding Cobb's incriminating statements:

"Evidence has been admitted which may show that the defendant made statements to law enforcement concerning crimes charged by the State. It is for you to determine the weight and credit to be given such evidence. You may use your common knowledge and experience in regard to such matter(s) and consider any evidence I have admitted.

"You should consider all evidence, which may bear upon the weight and credit to be given any such statement(s)."

The State's objection to this instruction was overruled, and the prosecutor reserved the issue for later appeal.

The jury also was instructed on felony first-degree murder, second-degree intentional murder, and voluntary manslaughter regarding Kasey. Regarding Alannah, the jury was instructed on felony first-degree murder, unintentional second-degree murder, and involuntary manslaughter. Cobb was convicted of voluntary manslaughter in Kasey's death and involuntary manslaughter in Alannah's death.

### Analysis

## Suppression of Statements Because of Agents' Lies and Religious References

Cobb first argues that his incriminating statements from the August 1997 and July 1999 interviews should have been suppressed because they were involuntary products of both the agents' lies and their improper appeals to his religious faith.

"When a trial court conducts a full hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely, voluntarily, and intelligently given, and admits the statement into evidence at the trial, an appellate court accepts that determination if there is substantial competent evidence to support the trial court's determination. [Citation omitted.] After a trial court has determined the confession was voluntary, an appellate court will not reweigh the evidence. [Citation omitted.]" *State v. Lane,* 262 Kan. 373, 382-83, 940 P.2d 422 (1997).

In *State v. Wakefield,* 267 Kan. 116, 977 P.2d 941 (1999), the defendant appealed the district court's refusal to suppress state-

ments he made during an interrogation in which officers falsely represented that they had information and evidence implicating the defendant in a murder. The Kansas Supreme Court used the following factors to determine whether the confession was voluntary under the totality of the circumstances: "(1) the duration and manner of interrogation; (2) the accused's ability upon request to communicate with the outside world; (3) the accused's age, intellect, and background; and (4) the fairness of the officers in conducting the interrogation." 267 Kan. at 126.

The *Wakefield* court noted that the questioning officer in *Frazier v. Cupp*, 394 U.S. 731, 739, 22 L. Ed. 2d 684, 89 S. Ct. 1420 (1969), falsely told the defendant that his cousin had already confessed. Despite this falsehood, the United States Supreme Court found the misrepresentation was insufficient under the totality of the circumstances to make an otherwise voluntary confession inadmissible. 267 Kan. at 128.

The *Wakefield* court found the officers' conduct in that case followed from the State's interest in conducting a thorough and accurate investigation, and such tactics did not make a confession involuntary so long as the statements were otherwise the product of the defendant's own free will. Given the lack of threatening behavior or unfulfilled promises by the officers, the court concluded the misrepresentations did not make the defendant's confession involuntary. 267 Kan. at 127-28.

Applying the *Wakefield* factors to this case, we conclude the manner and the duration of the interrogations did not make Cobb's statements involuntary. He was given several breaks during the August 1997 interrogation, and the July 1999 interrogation lasted only 4 hours. Cobb did not complain that he was physically threatened by or that he had received any unfulfilled promises from the agents. He never requested to communicate with the outside world, and, as the district court noted, he was an adult of average intellect who had been in the United States Army and who had previous experience with the criminal justice system. All of the first three factors weigh in favor of voluntariness.

As for the officers' fairness, although the agents in this case did misrepresent the strength of the evidence they already possessed,

we believe it is unlikely these misrepresentations overbore Cobb's will under the totality of the circumstances. At times, he was the party who urged the continuation of the conversations. We hold that substantial competent evidence supports the district court's ruling that the misrepresentations did not render Cobb's statements involuntary.

The agents' manipulation of Cobb through repeated references to his religious beliefs during the July 1999 interview is somewhat more troubling because of the lack of controlling precedent. The agents initiated the topic, although Cobb was all too eager to continue the theme.

No Kansas cases have dealt specifically with whether an interrogator may use religion to appeal to a suspect to make a statement. Cobb relies primarily upon *Carley v. State,* 739 So. 2d 1046 (Miss. App. 1999), in arguing that the religious tone rendered his resulting statements involuntary.

In *Carley*, a 14-year-old boy with a mental disability admitted to shooting his parents after officers made repeated references to the Lord and told him the only way he could obtain religious salvation and see his parents again was by telling the truth about his sins. Under the totality of those circumstances, the court concluded Carley's will was overborne and his confession involuntary. The officers' invocation of the deity, their references to Heaven and Hell, and their promises of leniency and religious salvation went too far. 730 So. 2d at 1054.

*Castleberry v. Alford,* 666 F.2d 1338 (10th Cir. 1981), had the opposite result in a situation where the defendant was an adult. As police officers drove Castleberry to the station for questioning, they took him for a visit with one of their ministers. The evidence as to exactly how this came to pass was disputed. After Castleberry met privately with the minister, where he prayed and listened to biblical passages about confession and forgiveness, he stated for the first time that he had killed his wife and children.

The Tenth Circuit Court of Appeals upheld the state court's determination that Castleberry's confession was voluntary. The court considered Castleberry's mental capabilities, including his age, his average intelligence, his level of education, and his clean

record. The court also found there was no particular misconduct on the part of the officers, and the visit to the minister was not objectionable in and of itself. 666 F.2d at 1341-43.

We view Cobb's case as a close one. Although he was older and more intelligent than the defendant in *Carley*, the references to religion during his last interview can best be described as constant and pervasive. The agents made the most of their knowledge of his professed faith, gleaned from the August 1997 contact, and Cobb's obvious religious fervor made him vulnerable to coercion when he was urged to consider the effect his failure to confess would have on his salvation.

We cannot, however, conclude that Cobb's incriminating statements were involuntary. He was an adult, and, even when compared to the defendant in *Castleberry*, somewhat older and more experienced. Also, as mentioned, he joined into the religious discussion enthusiastically and urged the agents to continue talking to him rather than place him under arrest. In the end, we view the situation as comparable to one in which a police officer is aware that a suspect feels most comfortable when talking to a person who shares his or her opinions on politics. The officer would be permitted to feign agreement with and enthusiasm for the defendant's position and to try to make cooperation in the investigation consistent with the defendant's world view. This tactic would not make resulting incriminating statements involuntary if the suspect was mature and of normal intelligence. We are reluctant to arrive at any holding to the contrary in this case and thereby suggest that persons of deep religious faith should be presumed to be more gullible and easily manipulated than those with deeply held secular beliefs or opinions.

We also note that, even if we were to conclude the agents' emphasis on religion was so coercive as to make Cobb's July 1999 statements involuntary, the district court's failure to suppress them would be harmless. Cobb had already placed himself at the scene, at least as an aider and abettor in Kasey's rape and homicide. On the evidence in this case, he would have been found guilty even if his last incriminating statement had not been admitted.

Suppression of Statements for Denial of Right to Counsel

Cobb argues the district court should have suppressed his August 1997 and July 1999 statements to police because they were made in violation of his right to counsel. We again review the district court's decision to ensure it was supported by substantial competent evidence. *Lane,* 262 Kan. at 382-83.

Cobb clearly waived his right to counsel in his first interview in 1997. This issue remains alive because he gave the agents the letter retracting his prior statements and saying: "Anything to be discussed in future situations has to be done in the presence of my attorney."

The Kansas Supreme Court has discussed when officers may conduct further interrogation after an accused has asked for counsel:

"When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further *police-initiated* custodial interrogation even if he has been advised of his rights. An accused who has expressed a desire to remain silent is not subject to further interrogation by law enforcement authorities until counsel has been made available to the accused, *unless the accused initiates* further communication, exchanges, or conversations with the authorities." (Emphasis added.) 262 Kan. at 383.

This issue is without merit because Cobb initiated his further contact with the agents by telling them he wanted to explain the letter. In addition, the officers read Cobb his *Miranda* rights again, and he orally waived them and signed a *Miranda* card explaining those rights. Cobb had voluntarily waived his right to counsel during the 1997 interviews.

Cobb further contends that his right to counsel was violated a second time during the July 1999 interview when he requested a lawyer and was not provided with one. The district court found this constituted an ambiguous request for an attorney and the agents had a right to inquire and ask clarifying questions. See *State v. Donesay,* 265 Kan. 60, 73, 959 P.2d 862 (1998).

We agree with the district court. Cobb requested an attorney if he was not getting arrested that day. The agents were not required to follow up on this ambiguous request, but Lundin noted it and

Cobb said he wanted to continue talking. Cobb also reinitiated communication with the agents after making the request, essentially begging the agents to continue before moving to arrest. The agents were permitted to continue questioning him, and Cobb's statements in 1999 were not made in violation of his right to counsel.

## Admission of Mitchell's Testimony Regarding Alannah's Death

Cobb's next challenge is directed at his conviction for Alannah's death. He contends Mitchell should not have been permitted to testify the death was a homicide.

The absence of a trial objection dooms this challenge. A party must make a timely and specific objection to the admission of evidence at trial in order to preserve the issue for appeal. *State v. Deal*, 271 Kan. 483, 492, 23 P.3d 840 (2001). Although Cobb urges this court to consider this issue for the first time on appeal, he has not demonstrated that such consideration is necessary to serve the ends of justice or to prevent the denial of his fundamental rights. We decline to reach the merits of this issue.

## Refusal to Admit Turvey Testimony Regarding Inconsistent Evidence

Cobb next challenges the district court's limitation of Turvey's testimony.

This court recently described our standard of review regarding expert opinion testimony:

"A trial court has broad discretion concerning the qualification of an expert witness and the admissibility of expert testimony. Expert opinion testimony is admissible if it aids the jury with unfamiliar subjects or in interpreting technical facts or assists the jury in arriving at a reasonable factual conclusion. If the normal experience and qualifications of the jurors permit them to draw proper conclusions from the given facts and circumstances, expert conclusions or opinions on that subject are not admissible. [Citation omitted.]

"An expert witness may give an opinion on the ultimate issue but may only do so insofar as it aids the jury in interpreting technical facts or assists the jury in understanding the material in evidence. An expert witness has no right to pass on the weight or credibility of evidence; these are matters strictly within the province of the jury. [Citation omitted.]" *Cimarron Feeders v. Bolle*, 28 Kan. App. 2d 439, 449, 17 P.3d 957, *rev. denied* 271 Kan. 1035 (2001).

"Judicial discretion is abused only when no reasonable person would take the view adopted by the trial court." *State v. Broyles*, 272 Kan. 823, 837, 36 P.3d 259 (2001).

Cobb essentially argues that it was unfair to permit KBI forensic scientist Robbins to testify about how the crime scene could be consistent with Cobb's story and then refuse to allow his forensic scientist to do the opposite. He relies primarily upon *State v. Brickhouse*, 20 Kan. App. 2d 495, 890 P.2d 353, *rev. denied* 257 Kan. 1093 (1995). In *Brickhouse*, this court found it was an abuse of discretion to admit incriminating hearsay statements tending to convict a defendant while denying admission of exculpatory hearsay evidence from the same declarant. 20 Kan. App. 2d at 500. Cobb also argues the district court erred in relying on Turvey's failure to examine the evidence.

Cobb's case is distinct from *Brickhouse*. Here, we are talking about two different witnesses testifying about two different subjects, not one out-of-court declarant with both helpful and hurtful things to say. Robbins' testimony about the possibility of sexual assault that leaves no DNA evidence behind was not given by any other witness and was not within the experience or knowledge of lay jurors. The testimony Turvey was prepared to give was cumulative of other evidence and within the realm of lay understanding.

Moreover, we interpret the district court's reference to failure to review the evidence to mean Turvey's failure to visit the crime scene inside of the apartment or to personally examine the physical evidence, not an articulation of an erroneous belief that Turvey did not review documents or photos.

We see no abuse of discretion in the district court's refusal to admit Turvey's proffered testimony. It was not necessary to aid the jury with an unfamiliar subject, to interpret technical facts, or to assist the jury in arriving at a reasonable conclusion. The jury was capable of perceiving and understanding the inconsistencies between Cobb's statements and the physical evidence.

## Sufficiency of Evidence to Support Voluntary Manslaughter

Cobb next argues insufficient evidence was presented that the killing of Kasey was committed in the heat of passion or upon a

sudden quarrel. Voluntary manslaughter is the intentional killing of a human being committed in the heat of passion or upon a sudden quarrel. K.S.A. 21-3403(a).

" 'When the sufficiency of the evidence is challenged, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' " *State v. Mason,* 268 Kan. 37, 39, 986 P.2d 387 (1999) (quoting *State v. Abel,* 261 Kan. 331, 337, 932 P.2d 952 [1997]).

In *State v. Harris,* 27 Kan. App. 2d 41, 998 P.2d 524 (2000), the defendant was charged with intentional second-degree murder but convicted of voluntary manslaughter upon a sudden quarrel or in the heat of passion. As Cobb does in this case, he argued on appeal that insufficient evidence supported the conviction. The court affirmed, stating:

"[W]here a defendant is charged with second-degree intentional murder and convicted of voluntary manslaughter based on sudden quarrel or heat of passion, the conviction may stand even absent evidence of sudden quarrel or heat of passion, as long as the evidence was sufficient to convict the defendant of second-degree intentional murder." 27 Kan. App. 2d at 46.

In essence, the defendant had received a windfall: The jury had found the defendant intentionally killed the victim but believed there were mitigating circumstances justifying conviction of the less serious crime. The defendant could not complain his conviction was based on insufficient evidence, so long as sufficient evidence existed to convict him of the greater offense of second-degree murder. 27 Kan. App. 2d at 46-47.

We agree with Cobb that the evidence Kasey was killed in the heat of passion or upon a sudden quarrel is relatively weak. Cobb told Scott he had "got into it" with a woman and had choked her. The jury could have inferred that "got into it" meant an argument or a physical fight. There was a scuff on the wall of Kasey's apartment, one of Kasey's shoes was on the love seat, and a cushion was on the floor. Regardless, *Harris* is controlling. The evidence was sufficient to support second-degree murder, and Cobb cannot

complain that the jury gave him a break by finding him guilty of the less serious offense.

## Admission of Scott Testimony Regarding Choking

The standard of review regarding a district court's admission of evidence is abuse of discretion. *State v. Lopez*, 271 Kan. 119, 136, 22 P.3d 1040 (2001).

Cobb contends the district court erred in permitting Scott's testimony about Cobb's admission that he choked a woman he had been seeing who was married and had a child. In Cobb's view, the evidence could not properly be admitted under K.S.A. 60-455 and was not otherwise relevant because it could not be connected to Kasey.

Cobb is correct that 60-455 did not provide a vehicle for admission of this evidence. That statute deals with the propriety of admission of evidence of *other* crimes; the State sought to introduce this evidence believing it referred to *the* crime for which Cobb was on trial. The evidence—that Cobb admitted to his friend that he had choked a married mother of a young girl, a woman he was seeing around the same time that the body of a strangled and suffocated woman with similar family circumstances was found—was highly relevant to the State's case. Scott also was able to testify that she had once given Cobb a ride to Kasey's apartment complex, where she understood his girlfriend lived. The district court did not abuse its discretion by admitting Scott's testimony about Cobb's admission.

## Admission of False Confession Expert Testimony

The State's first contention in its cross-appeal is that the district court abused its discretion by permitting Leo to testify as a defense expert on the phenomenon of false confessions. This is an issue of statewide importance, it says, because "Dr. Leo will be a regular visitor to Kansas courtrooms when a confession is offered in a major case if testimony of this nature is allowed." We agree that our review of this reserved question is appropriate. See *State v. Golston*, 269 Kan. 345, 346, 7 P.3d 1132 (2000).

After a hearing, the district court found Leo's testimony was admissible under the *Frye* test.

"The admissibility of expert testimony is subject to K.S.A. 60-456(b). The *Frye* test, *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), however, acts as a qualification to the 60-456(b) statutory standard. *Frye* is applied in circumstances where a new or experimental scientific technique is employed by an expert witness.

"*Frye* requires that before expert scientific opinion may be received into evidence, the basis of the opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. If a new scientific technique's validity has not been generally accepted or is only regarded as an experimental technique, then expert testimony based upon the technique should not be admitted." *Kuhn v. Sandoz Pharmaceuticals Corp.*, 270 Kan. 443, Syl. ¶¶ 2, 3, 14 P.3d 1170 (2000).

Although the admission of expert testimony is generally governed by an abuse of discretion standard, the Kansas Supreme Court has held that a district court's *Frye* ruling should be reviewed de novo "because the outcome of a *Frye* holding transcends individual cases such that applying less than a de novo standard could lead to inconsistent treatment of similarly situated claims." *State v. Shively*, 268 Kan. 573, 576, 999 P.2d 952 (2000).

Cobb argues that *In re B.M.B.*, 264 Kan. 417, 420-21, 955 P.2d 1302 (1998), supports admission of Leo's testimony. In that case, the district court permitted a defense expert to testify at a motion for new trial about the appropriateness of the questioning of a 10-year-old boy during a police interview. The expert said the techniques used in the interview were wholly inappropriate for use with children. Further, a substantial number of children would have agreed to what was being suggested to them because of the level of coercion and pressure present in the interview, regardless of whether they were guilty. We get little guidance from this case, however, because the issue of whether this testimony was properly admitted before a jury was not the focus of the appeal.

State and federal courts are split on whether to admit expert testimony on false confessions. See Major James R. Agar, II, *The Admissibility of False Confession Expert Testimony*, Army Law. 26, 35-37 (Aug. 1999). We note particularly *State v. Davis*, 32 S.W.3d 603 (Mo. App. 2000), in which the defendant appealed the district court's exclusion of expert testimony by Leo on interrogation tech-

niques, false confessions, and coercive persuasion. The Missouri Court of Appeals recognized that this was an issue of first impression in Missouri, ultimately affirming. 32 S.W.3d at 607-08, 612. Along the way, it observed that *United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996), had allowed expert testimony on coercive police interrogation and the incidence of false confessions under the *Daubert* standard. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). However, it also observed that in *State v. Ritt*, 599 N.W.2d 802 (Minn. 1999), the Minnesota Supreme Court had excluded such testimony, apparently under the *Frye* test.

The *Davis* court found Leo's offer of proof regarding a suspect's thought process when interrogated under circumstances similar to the defendant's was particularized to the circumstances of the case and was not generic credibility testimony. The court concluded the testimony invaded the jury's province to make a credibility determination about the defendant's statement. 32 S.W.3d at 608.

The *Davis* court likened the situation to that in a Missouri Supreme Court eyewitness identification case, in which the court affirmed the district court's exclusion of expert testimony about the unreliability of cross-racial identification. See *State v. Lawhorn*, 762 S.W.2d 820, 822-23 (Mo. 1988). In that case, the court determined the information was within the jury's common knowledge and the reliability of the identification could be challenged through cross-examination.

"Adapting the reasoning of the Supreme Court [in *State v. Lawhorn*] to this case, the fact that police interrogation may be persuasive or coercive does not leave defendant without protection if the trial court denies expert testimony on this topic. Cross-examination is an adequate tool to expose police conduct, and closing argument gives the defendant a forum to further develop his theory that interrogation techniques are coercive. The jury is capable of understanding the reasons why a statement may be unreliable; therefore, the introduction of expert testimony would be 'a superfluous attempt to put the gloss of expertise, like a bit of frosting, upon inferences which lay persons were equally capable of drawing from the evidence.' [Citations omitted.]

"The defendant had a full opportunity to cross-examine the police officers that interrogated him about their techniques. The jury heard testimony regarding the conditions of defendant's interrogation, the length of time defendant was interrogated, the receipt and waiver of *Miranda* rights, and the content of the police

questions and defendant's statements. It was reasonable for the trial court to conclude that the jury could decide the issue of the statement's reliability using its common knowledge. Consequently, the jury would not be aided by Dr. Leo's testimony." *Davis*, 32 S.W.3d at 609.

The Kansas Supreme Court has arrived at the same conclusion regarding expert testimony on the unreliability of eyewitness identifications, ruling such testimony should not be admitted at trial. See *State v. Gaines*, 260 Kan. 752, 755-63, 926 P.2d 641 (1996). In *State v. Warren*, 230 Kan. 385, 395-97, 635 P.2d 1236 (1981), the court reviewed cases from several jurisdictions and concluded that a cautionary instruction coupled with vigorous cross-examination and persuasive argument by defense counsel should be adequate to protect the rights of the defendant.

We find the reasoning of *Davis* and the Kansas cases regarding eyewitness identifications persuasive. The type of testimony given by Leo in this case invades the province of the jury and should not be admitted. Cross-examination and argument are sufficient to make the same points and protect the defendant. Cobb got more protection than future defendants will be entitled to claim.

Propriety of Confession Instruction

The State next argues that the district court erred by giving an instruction that focused on an evaluation of Cobb's incriminating statements. PIK Crim. 3d 52.17, Confession, provides: "The Committee recommends that there be no separate instruction given as to confession." The Kansas Supreme Court has affirmed this statement when a defendant has challenged the district court's failure to give an additional jury instruction on confession. See *State v. Shaffer*, 229 Kan. 310, 316, 624 P.2d 440 (1981) ("A special instruction bearing on the credence to be given a confession or admission is not required when the jury is given a general instruction bearing on the credibility of the testimony of the witnesses.") However, no Kansas case deals with a State challenge to a confession instruction. We therefore address the merits of the issue as one having statewide importance.

"Where a party objects to a jury instruction prior to the jury retiring to consider its verdict, as occurred in this case, the reviewing court is required to consider

the instructions as a whole without isolating any one instruction, and, if the instructions properly and fairly state the law as applied to the facts in the case when considered as a whole, and if the jury could not reasonably be misled by them, then they do not constitute reversible error even if they are in some small way erroneous." *State v. Rodriguez*, 269 Kan. 633, 637, 8 P.3d 712 (2000).

Although PIK is correct to discourage the inclusion of such instructions in most cases, we see no error in its inclusion in this case. In essence, it merely repeated the language of PIK Crim. 3d 52.09, which was already given to the jury as part of Instruction No. 1. We hold that the instructions as a whole clearly and accurately stated the law, and the inclusion of the confession instruction here did no violence to the State's position.

Affirmed.