(191 P.3d 341)
No. 97,507

STATE OF KANSAS, *Appellee*, v. DONNIE E. REED, *Appellant*.

Opinion filed August 29, 2008.

*Korey A. Kaul,* of Kansas Appellate Defender Office, for appellant.

*Sheryl L. Lidtke,* deputy district attorney, *Jerome A. Gorman,* district attorney, and *Paul J. Morrison,* attorney general, for appellee.

Before MALONE, P.J., BUSER, J., and LARSON, S.J.

MALONE, J.: Donnie E. Reed appeals his convictions and sentences for two counts of rape and two counts of aggravated indecent liberties with a child. Reed claims: (1) the district court erred in allowing an expert witness to testify about why children may recant allegations of sexual abuse; (2) the prosecutor committed misconduct during her opening statement by commenting on Reed's failure to give a formal statement to the police; (3) K.S.A. 21-3502(a)(2) and K.S.A. 21-3504(a)(1) are unconstitutional under the Due Process Clause of the Fourteenth Amendment to the United States Constitution; (4) Reed was denied a fair trial based on cumulative error; and (5) Reed's constitutional rights were violated when the district court used his criminal history to enhance his sentence. Finding no error, we affirm.

In the summer of 2004, L.R., d/o/b 10/22/89, lived in Kansas City, Kansas, with her father, Reed, and her three brothers. Sometime that summer, L.R. began worrying that she might be pregnant and she relayed these worries to her grandmother. When Reed learned that his daughter could be pregnant, he asked his older

daughter, Angela Reed, to take L.R. to the University of Kansas (KU) Medical Center for a pregnancy test.

On June 21, 2004, Angela took L.R. to the KU Medical Center for an examination, and L.R. learned that she was pregnant. When Angela asked L.R. who the father was, L.R. told her it was Reed. Angela drove L.R. back to Reed's house and they both told him the news.

Later that evening, Angela called the police and reported what L.R. had told her earlier that day. Angela met with the police at a location near Reed's house, and then she led the police to Reed's residence. Inside the house, the officers found L.R. and Reed sleeping together on a sofa bed. The officers woke them up and arrested Reed. After Reed was taken away, L.R. told the officers that she had found out earlier that day that she was pregnant and that Reed was the father of the child.

The next day, Detective Ken Cantwell made an appointment for L.R. to be examined at Sunflower House, a child advocacy center. Angela took L.R. to Sunflower House later that day. At Sunflower House, Sara Bile, a forensic interviewer, interviewed L.R. while Cantwell watched the interview in another room on a closed-circuit television. During the interview, L.R. told Bile that Reed started sexually abusing her in December 2002 by inserting his finger into her vagina. Soon thereafter, Reed began having sexual intercourse with L.R. According to L.R., from December 2002 to June 2004, Reed had sexual intercourse with her about three times a week. L.R. stated that if she refused to sleep with Reed, he would spank her with a belt or an extension cord. Finally, L.R. stated that she was pregnant with Reed's child.

After the interview, Angela Van Dong, a nurse practitioner at Sunflower House, examined L.R. Van Dong did not find any markings or injuries to L.R.'s genitalia, but she did notice two scars on L.R.'s back. According to Van Dong, L.R. stated that the scars were the result of "whoopings" her father had given her with a belt or an electrical cord. Van Dong stated that one of the scars was raised, circular, and corresponded with a whipping injury caused by an electrical cord.

On June 23, 2004, Cantwell went to the Wyandotte County jail to interview Reed. Cantwell informed Reed of his rights and then told him that he was accused of raping his daughter. According to Cantwell, Reed responded by saying, "I ain't never raped my daughter." Cantwell then told Reed that L.R. had stated that the sex was not consensual and that she was pregnant as a result of having sex with Reed. According to Cantwell, Reed replied, "Anything that happened between us was consensual." Reed then declined to give a formal statement to Cantwell.

On July 15, 2004, L.R. had an abortion. The medical staff at the clinic where the abortion was preformed provided Cantwell with tissue samples taken from the aborted fetus. These samples, along with oral swabs taken from L.R. and Reed were sent to a DNA lab in New Orleans, Louisiana. DNA testing performed at the lab determined that there was 99.99% probability that Reed was the father of the child. The test results also indicated that the fetus was the result of an incestuous relationship.

The State charged Reed with two counts of rape, two counts of aggravated indecent liberties with a child, and two counts of abuse of a child. At the preliminary hearing, L.R. recanted her allegations that Reed had sexually abused her. As a result, the State introduced the videotaped interview between L.R. and Bile at the Sunflower House. The district court bound Reed over for trial.

At Reed's trial, L.R. again denied that she and Reed had engaged in sexual relations and stated that a former boyfriend had gotten her pregnant. When asked why she told people that she was pregnant with Reed's baby, L.R. stated that she wanted to have an abortion and believed others would pay for the abortion if they thought she was pregnant with Reed's child. L.R. also stated that she was mad at Reed for being such a strict father and wanted to get back at him by telling people that she was pregnant with his baby. Regarding the alleged physical abuse, L.R. stated that Reed gave her "whoopings" with a belt because she would act bad and hardheaded. In addition to L.R., Angela Reed, Van Dong, and Cantwell testified for the State. The videotaped interview between L.R. and Bile was also played for the jury. Reed did not testify at trial.

The jury found Reed guilty of two counts of statutory rape and two counts of indecent liberties with a child, but the jury acquitted Reed of the abuse of a child charges. The district court sentenced Reed to a controlling term of 419 months in prison. Reed timely appeals.

### Child-victim recantation

Reed claims the district court erred when it allowed Bile, the forensic interviewer who interviewed L.R. at Sunflower House, to opine about why a child might recant an allegation of sexual abuse. Reed argues that Bile's opinion invaded the province of the jury to determine L.R.'s credibility at trial. Whether the district court improperly allowed one witness to express an opinion on the credibility of another witness is a question of law subject to de novo review. *State v. Drayton*, 285 Kan. 689, 701-02, 175 P.3d 861 (2008); *State v. Oliver*, 280 Kan. 681, 695, 124 P.3d 493 (2005); *State v. Elnicki*, 279 Kan. 47, 50-51, 53-54, 105 P.3d 1222 (2005).

During Bile's direct examination by the prosecutor, the following exchange took place:

"Q. All right. Also based on your experience, your education, your training, have you—are you familiar with the phrase of recanting or recantation when a child takes back what they said?

"A. Yes, I am.

"Q. Okay. And is that a common phenomenon or uncommon?

"A. It's—when we went to our forensic interview training, one of the things they told us to be especially mindful of, and we're told the relationship between the alleged perpetrator and the victim, to pay attention to a relationship where a child who doesn't have a strong foundation with this person or an emotional connection, they might not have as hard of a time talking about what happened, or, you know, saying yes, this actually did happen; where a child who does have a strong bond, a strong connection with this person might even possibly live in the same home as this person, might have a hard time coming forward and saying something happened, and then might have some immediate impact on their statements, on their family environment or the environment they live in. They might receive a pressure to take back what they said and might want to go back to what they know and what's familiar to them.

"Q. Besides the impact on the family overall, what other—what other factors are there to consider when trying to explain the recantation? Is there anything else besides the impact of the family overall?

"A. There's an impact to the child. There's a chance that the child might be taken from the home. There's a chance their siblings might be also taken from the home and the family broken up. There's a chance that someone they care very much about might be very angry with them. There's a chance that extended family might be putting pressure on them, or the alleged perpetrator might be the bread winner in the family and the family looses [sic] their home. There's all kinds of factors where a child makes a disclosure about someone in their immediate environment that they live in.

"Q. All right. Is there any research on what age groups specifically recant more than other age groups, or is it just kind of across the board for a minor child?

"A. There's actually a lot of research out there. It shows the older the child is, the greater understanding they have of the impact on the because and effect of their statement, causing these outcomes. And so, the older the children are, the more likely they are to have a recantation."

Reed did not object to this testimony at trial. Generally, issues not raised before the district court cannot be raised on appeal. K.S.A. 60-404; *State v. Shopteese*, 283 Kan. 331, 339, 153 P.3d 1208 (2007). However, we will consider Reed's claim on appeal because the issue involves only a question of law arising from admitted facts, and consideration of the issue is necessary to serve the ends of justice. See 283 Kan. at 339.

In *State v. McIntosh*, 274 Kan. 939, 58 P.3d 716 (2002), the State called an expert witness to testify about common patterns of behavior in children who are sexually abused. The expert also testified that the alleged victim displayed behaviors consistent with a sexually abused child. The Kansas Supreme Court allowed the testimony. The court indicated that as long as the expert does not testify that he or she *believes the victim, i.e.*, opines on the credibility of the alleged victim, an expert witness is permitted to testify about common behaviors among sexually abused children. 274 Kan. at 959-60.

Here, Bile only gave her expert opinion as to why a hypothetical child might recant an initial allegation of sexual abuse. Bile did not render an opinion about L.R.'s credibility. Furthermore, Bile did not even render an opinion as to whether L.R. shared similar characteristics with a child who would be prone to recant. Based on *McIntosh*, Bile's testimony did not invade the province of the jury.

Reed cites *State v. Cobb*, 30 Kan. App. 2d 544, 43 P.3d 855, *rev. denied* 274 Kan. 1115 (2002). In *Cobb*, a defense expert testified

that the interrogation techniques used by the officers when questioning the defendant have been known to contribute to false confessions. Judge Carol A. Beier, writing for the panel, held that the expert's testimony about the interrogation techniques "invades the province of the jury and should not be admitted. Cross-examination and argument are sufficient to make the same points and protect the defendant." 30 Kan. App. 2d at 567.

The breadth of *Cobb*'s holding was drastically limited by *Oliver*, where Justice Beier, writing for the Supreme Court, held:

"[A] criminal defendant against whom a confession will be admitted may be permitted to introduce expert psychological or psychiatric testimony bearing on his or her ability to respond reliably to interrogation. It is essential, however, that the testimony actually tell jurors something they would not otherwise know from their usual human experience and that it remain hypothetical or theoretical. It must stop short of expressing the expert's judgment on the defendant's reliability in the specific instance of the confession submitted for the jury's consideration." 280 Kan. at 702.

In reaching this result, the Supreme Court distinguished *Cobb*, finding that its holding only applied to expert testimony concerned solely with interrogation techniques, and not "with the particular psychological makeup of the defendant or with the potential for interaction between that makeup and interrogation techniques used by law enforcement." 280 Kan. at 698-99.

Based on *McIntosh* and *Oliver*, Bile's testimony about why children may recant allegations of sexual abuse was admissible. Bile did not render an opinion about L.R.'s credibility, and her testimony did not invade the province of the jury. See also *State v. Huntley*, 39 Kan. App. 2d 180, 187-89, 177 P.3d 1001 (2008) (finding the district court abused its discretion in denying defendant's continuance request to retain expert on child-witness interview techniques); *Mullins v. State*, 30 Kan. App. 2d 711, 717-18, 46 P.3d 1222, *rev. denied* 274 Kan. 1113 (2002) (finding defense attorney rendered ineffective assistance when he did not consult with expert concerning interviewing techniques used in child sex abuse cases).

### Prosecutorial misconduct

Next, Reed claims that the prosecutor committed misconduct during her opening statement when she stated that Reed refused

to give a formal statement to the police. Reed argues that this statement constituted an impermissible comment about exercising his Fifth Amendment right to remain silent.

Appellate review of an allegation of prosecutorial misconduct requires a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, the appellate court decides whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Albright*, 283 Kan. 418, 428, 153 P.3d 497 (2007).

In the second step of the two-step analysis, the appellate court considers three factors: "(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling." 283 Kan. at 428.

During her opening statement, the prosecutor stated: "On June 23rd, 2004, the police went to the Wyandotte County jail to speak with the defendant. Detective Cantwell walked into the jail and introduced himself. The defendant refused to give Detective Cantwell a formal statement, but said, he responded . . . ." At that point, defense counsel objected and the parties approached the bench. The following exchange then took place between the attorneys and the district court:

"Mr. Cahill [defense counsel]: The prosecutor has just commented on my client's exertion of his Fifth Amendment rights. That's clearly improper, and I'd ask for a mistrial at this time. He can't get a fair trial at this point.

"The Court: Overruled at this point.

"Ms. Lidtke [the prosecutor]: Okay. Judge, let me explain what happened. There was a ruling while you were out of town or at a doctor's appointment regarding statements he made at the jail, and at that time he refused to talk to the detective. However, he made statements to the detective about what had happened, and that's what I was trying to lead into. I wasn't commenting on the fact that he gave—he didn't give a formal statement about what happened, because I'm going to talk about the statement that he did give.

"The Court: He gave statements, and those have been held to be voluntarily given.

"Mr. Cahill: I need to make a record on this. Yes, those—those are admissible, and my client stipulated to the voluntariness of those statements, but that has nothing to do with him refusing to give a formal statement. She can say he said this, but she cannot—clearly cannot say that he refused to give a formal statement, and I think that is—

"Ms. Lidtke: Judge, I would ask you to give the jury an instruction to disregard the statement that I made about him refusing to give a statement. I would ask that it not be a mistrial at this point. Mr. Cahill's correct that I cannot comment on his right to remain silent, and I didn't take it that I was taking that as a comment that he actually gave a statement, but not a tape-recorded statement is what I was getting at, and I think I probably used the wrong words.

"Mr. Cahill: That's not sufficient. That's not sufficient. I mean, there's nothing more clear under the law than the prosecutor not being able to comment on a person refusing to give a statement.

"The Court: I'm not going to start over, Mr. Cahill."

As a general rule, it is unconstitutional for the State to elicit evidence at trial of a defendant's post-*Miranda* silence. *Doyle v. Ohio*, 426 U.S. 610, 618, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). In *State v. Edwards*, 264 Kan. 177, 195, 955 P.2d 1276 (1998), our Supreme Court stated:

"A *Doyle* violation occurs when the State attempts to impeach a defendant's credibility at trial by arguing or by introducing evidence that the defendant did not avail himself or herself of the first opportunity to clear his or her name when confronted by police officers but instead invoked his or her constitutional right to remain silent."

Here, the prosecutor's comment, when viewed in isolation, comes close to being a *Doyle* violation. However, the prosecutor did not make the statement for the purpose of impeaching Reed's credibility, but only to inform the jury of the context in which Reed made a brief statement to Cantwell. The prosecutor did not argue that Reed's refusal to give a formal statement was an indication of his guilt. Based on *Edwards*, the prosecutor's brief remark during the opening statement did not constitute a *Doyle* violation.

Even if the prosecutor's statement was improper, the prosecutor's conduct was not gross and flagrant and did not show ill will toward Reed. Based on the overwhelming evidence against Reed, especially the DNA evidence, the prosecutor's comment likely had

little weight in the minds of the jurors. Under these circumstances, the prosecutor's comment did not amount to reversible error. See *Albright*, 283 Kan. at 428.

### Constitutionality of K.S.A. 21-3502(a)(2) and K.S.A. 21-3504(a)(1)

K.S.A. 21-3502(a)(2) defines rape as sexual intercourse with a child who is under 14 years of age. K.S.A. 21-3504(a)(1) defines aggravated indecent liberties with a child as sexual intercourse with a child who is 14 or 15 years old. It is an absolute defense to both crimes if the alleged perpetrator is married to the victim. See K.S.A. 21-3502(b); K.S.A. 21-3504(b).

On appeal, Reed argues that Kansas' statutory rape and aggravated indecent liberties statutes violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution because both statutes absolutely prohibit all unmarried adolescents from engaging in consensual intimate activity without regard to their maturity level. Whether a statute is unconstitutional is a question of law subject to an appellate court's unlimited review. *State v. Voyles*, 284 Kan. 239, 256, 160 P.3d 794 (2007).

Reed did not raise this argument before the district court. Where constitutional grounds are asserted for the first time on appeal, they are not properly before an appellate court for review. *State v. Alger*, 282 Kan. 297, 304, 145 P.3d 12 (2006). However, when it is necessary in order to determine the merits of the action or where the issues cannot be intelligently decided without doing so, the constitutionality of a statute should be decided, even if the parties failed to raise the constitutional questions, failed to plead the questions, or failed to present the questions to the district court. *State v. Sedillos*, 279 Kan. 777, 785, 112 P.3d 854 (2005). Thus, we will review Reed's claim.

In *Voyles*, the Supreme Court had to determine whether Kansas' aggravated criminal sodomy statute, K.S.A. 21-3506(a)(1), violated the Due Process Clause because it proscribed consensual, intimate activities of all unmarried persons under 14 years of age without regard to their maturity. Because the statute did not place restrictions on a fundamental right or treat suspect classes or genders

differently, the court applied a rational basis test to determine whether the statue was constitutional. The court determined that because the legislature has a legitimate goal of protecting children from adult sexual predators and the sodomy statute was rationally related to that goal, the statute passed the rational basis test and therefore was constitutional. 284 Kan. at 258-59; see also *State v. Taylor*, 33 Kan. App. 2d 284, 286-87, 101 P.3d 1283 (2004), *rev. denied* 279 Kan. 1010 (2005) (applying a rational basis test and finding that K.S.A. 21-3504[a][1] does not violate either the Due Process or Equal Protection Clauses).

Based on reasoning found in *Voyles* and *Taylor*, we conclude that K.S.A. 21-3502(a)(2) and K.S.A. 21-3504(a)(1) do not violate the Due Process Clause. The legislature has a legitimate goal of protecting children from adult sexual predators, and both statutes are rationally related to carrying out that goal. Reed's constitutional argument is without merit.

### *Cumulative error*

Next, Reed argues that his convictions should be reversed because of cumulative error.

" 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. [Citation omitted.]' " *State v. Davis*, 283 Kan. 569, 583, 158 P.3d 317 (2007) (quoting *State v. Ackward*, 281 Kan. 2, 29, 128 P.3d 382 [2006]).

Cumulative error will not be found when the record fails to support any error raised on appeal by the defendant. *Davis*, 283 Kan. 569, Syl. ¶ 8. At best, the record reflects a brief comment during the prosecutor's opening statement, which, viewed in isolation, may have constituted a *Doyle* violation. This is insufficient to support Reed's request for reversal of his convictions based on cumulative error.

### *Apprendi issue*

Finally, Reed claims the district court violated *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000),

when the district court used Reed's criminal history to enhance his sentence. Reed acknowledges that the Kansas Supreme Court rejected this argument in *State v. Ivory*, 273 Kan. 44, 46, 41 P.3d 781 (2002). This court is duty bound to follow Kansas Supreme Court precedent absent some indication the court is departing from its previous position. *State v. Beck*, 32 Kan. App. 2d 784, 788, 88 P.3d 1233, *rev. denied* 278 Kan. 847 (2004). The Kansas Supreme Court does not appear to be departing from its decision in *Ivory*. See *State v. Gonzalez*, 282 Kan. 73, 117-18, 145 P.3d 18 (2006). Therefore, Reed's sentencing claim is without merit.

Affirmed.