No. 88,987

STATE OF KANSAS, *Appellee,* v. CORNELIUS DEVON OLIVER, *Appellant.*

(124 P.3d 493)

Opinion filed December 16, 2005.

*Debra J. Wilson,* capital appellate defender, argued the cause and was on the brief for appellant.

*Debra S. Byrd Peterson,* deputy district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Phill Kline,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This case arises out of a quadruple homicide in Wichita. Defendant Cornelius Oliver appeals his convictions and hard 50 sentences on two counts of first-degree premeditated murder and two counts of first-degree felony murder in the deaths of Jermaine Levy, Quincy Williams, Odessa Ford, and Raeshawnda Wheaton.

Oliver raises five issues: (1) Did the police have probable cause to support his arrest? (2) Did the district court err in limiting testimony regarding his psychological disorders? (3) Did the district court err in instructing the jury on the lesser included offenses of capital and premeditated murder? (4) Was an instruction on compulsion warranted? and (5) Is the hard 50 sentencing statute unconstitutional?

## Facts

Investigation of the murders at the center of this case began when a Wichita police officer was dispatched to a house on a shooting complaint. Inside the house, the officer found four dead bodies. The bodies of Jermaine Levy, Quincy Williams, and Odessa Ford were in the front room. Raeshawnda Wheaton's body was in a bedroom.

Levy was sitting on the floor, leaning against a couch. Two bullets fired from a .380 semi-automatic handgun were recovered from his body; the points of entry were the lower left side of his head and the lower left side of his neck. One of his pockets was pulled out. Williams was facing a television and sitting on another couch. He had been shot three times, twice with a .38 caliber special revolver and once with the .380 handgun. Williams' entry wounds were on the top left side of his head, above his left eyebrow, and in the center lower area of his head. A bullet was found underneath Williams that had been fired from the .38 revolver. Ford was lying on her back on the floor. She had been shot in the head with a .38 revolver from 3 feet to 6 feet away. Investigators found no defensive wounds on these three victims.

In the bedroom, there was a bullet hole in the doorway to the closet and in the wall. These bullets had been fired from the .38

revolver. Wheaton was sitting between a wall and a bed. She had a pillow clutched to her face, and there were two bullet holes in the pillow. Wheaton sustained a graze wound on her left hand and a graze wound on her left cheek, which were classified as defensive wounds. Another shot went through her wrist. She had also been shot in the top of her head at close range. These bullets were fired by the .380 handgun.

Various shell casings from the .380 handgun were found at other points in the house. Police also found a live .380 round. The markings on it were consistent with a misfeed.

Jesse Hardyway, a friend of Williams, arrived at the house before the police. He testified that a video game was on the television on pause and that Williams had a video controller in his hand. Hardyway also testified that Ford was selling drugs for defendant out of her house. Another person who entered the house testified that he took the adapter to the video game.

In the bedroom, a ceiling tile had been moved. The police recovered a small amount of drugs and money from the ceiling.

Before arresting defendant Oliver, the police knew he and Wheaton shared a violent romantic history. They also knew Oliver was a gang member, and Levy and Williams were affiliated with a rival gang. The police were wary, however, of assuming the crimes were gang-related. Neither Levy nor Williams had been in a defensive position, and each appeared to have been shot from behind. Further, the killing of the two women, while not unheard of, would have been rare in gang crime. The police therefore decided to explore robbery and domestic violence, in addition to the gang theory, as motives for the murders.

There had been no forced entry, and the investigators concluded that the shooter was probably someone familiar to the victims. While at the crime scene, a police officer had received a sheet of paper with defendant's name written on it from an unidentified person.

Wheaton's father informed police about Wheaton's rocky relationship with Oliver and told them people suspected Oliver had committed the crime. He also told them that Oliver often stole

Wheaton's car. Wheaton's mother reported to police that Oliver had pulled a gun on Wheaton.

The police also learned from Ford's mother that Wheaton had described a fight with Oliver in which he dropped his gun and she picked it up and shot him with it. The same day, Wheaton had appeared at a hospital with injuries to her face. She was interviewed by a police officer but refused to file a complaint, claiming a stranger had attacked her. Oliver appeared at another hospital with a gunshot wound to his left shoulder. He also was interviewed by a police officer. Oliver first told the officer that he had been shot in a drive-by shooting; he later claimed he had shot himself.

Ford's mother also told police that Oliver had threatened Wheaton and Ford two days before the murders and that he was crazy. Oliver had said he would "get" the people helping Wheaton.

Police also searched a house associated with defendant and turned up three weapons, including a .380 handgun.

At this point, the police decided to arrest Oliver. One officer testified that, because Oliver had yet to surface and inquire about Wheaton, police feared he might leave town before he could be questioned.

The officers sent to arrest Oliver found him on his brother's porch. Oliver was wearing pants and a sleeveless tank top, which seemed odd to the officers because it was December and cold outside. The officers observed Oliver from their car until he started to leave the porch; then they arrested him. One of the officers testified that he observed blood on the toes of Oliver's shoes. Other clothing belonging to Oliver was found in the garage. Blood from both Oliver and Levy was found on that clothing. Other blood stains on the clothing could not be identified.

After his arrest, Oliver was placed in an interview room for 45 minutes. His shoes were taken, and he was shackled to the floor and handcuffed to the table. He was given *Miranda* warnings and agreed to speak with officers.

Oliver told the officers different versions of the events on the night of the homicide, initially saying he had nothing to do with the murders. When the officers told Oliver that they had spoken with Earl Bell and Demetrius Butler, whose nickname was "DJ,"

and that they wanted to clear up some discrepancies, Oliver continued to deny having anything to do with the shootings. Oliver referred to Bell as his "brother" or "stepbrother."

Oliver eventually said he regretted going over to the house where the bodies had been found. In this second version of his story, Oliver said he had walked up to the house, and Ford had opened the door. "Two dudes" were sitting on the couch, looking at him like "we gonna get you or we know who you is and we gonna get you." Oliver said he then talked to Wheaton, and she told him one of the men had a "glock." Oliver realized that the man did not have a "glock" but did have a .380 handgun. The men were playing a video game and calling him names like "crab," which was disrespectful toward his gang. Oliver said he was also seeing "stuff" out of the corner of his eye. He thought one of the men grabbed for his gun; so Oliver shot that man in the head. Ford then ran out of the bedroom, and the other man shot her. Oliver then started shooting again, and he said that he thought he had shot the other man. Oliver said he then ran away, hearing more shots as he was leaving. He claimed that he threw his gun, a .38 caliber revolver, into some bushes.

A detective responded to this story by presenting Oliver with contradictory physical evidence. Oliver then admitted that he had shot Ford once. He also said that he and Wheaton had wrestled and that she had been shot accidentally.

Eventually Oliver told a third version of his story. In this version, he admitted Bell and "DJ" had accompanied him to the house. He again stated that Ford let them in. Again, he claimed Wheaton told him that one of the men at the house had a gun. Oliver admitted that the two men were still playing the video game when he shot both with a .380 handgun in the back of the head. One was still shaking, so Oliver pushed him over. Oliver checked this man's pockets but decided not to take the lighter he felt there. Oliver claimed that his gun jammed, and Bell gave him a .38 revolver. Oliver then entered the bedroom where the frightened women were huddled. Ford started to run; so he shot her. He then fired a warning shot at Wheaton. She cowered under a pillow, and he

fired again. Oliver then retrieved his .380 handgun from Bell and shot Wheaton.

Oliver was charged with one count of first-degree premeditated murder pursuant to K.S.A. 21-3401(a) for the killing of Levy and with three counts of capital murder pursuant to K.S.A. 21-3439(a)(6) for the killings of Williams, Ford, and Wheaton.

Oliver testified in his trial, and, again, his account of events changed. This time, Oliver said Bell was the shooter. He asserted that Bell was upset and wanted to go over to Wheaton's house. Butler was carrying Oliver's .380 handgun. When the three arrived, Ford let them into the house. Oliver and Wheaton went into the bedroom to talk. Oliver thought he heard gunshots but did not think anything of it. He then saw Ford stumble. When he returned to the living room, Bell was holding a gun and told him to check Levy. Oliver complied. Bell then entered the bedroom and shot Wheaton. Oliver said he was too frightened to run. He also testified that he believed Bell had set him up, because it was Bell who had told him to wait on his brother's porch the day that Oliver was arrested. Oliver testified he did not inform police that Bell had committed the crimes because he "just [didn't] tell on people."

After trial had begun, the defense sought to introduce expert testimony from psychologist Todd Robert Poch on his diagnoses of Oliver's post-traumatic stress disorder and dependent personality disorder. Defense counsel asserted that the testimony addressed the "psychological environment" for Oliver's confession under *Crane v. Kentucky,* 476 U.S. 683, 90 L. Ed. 2d 636, 106 S. Ct. 2142 (1986), and would assist the jury in understanding why Oliver would claim responsibility for murders he did not commit. The State sought to exclude the testimony.

Poch's written report, which had been shared with the prosecution, stated that individuals with dependent personality disorder "tend to be passive and to allow other people (often a single other person) to take the initiative and assume responsibility for most major areas of their lives." Neither disorder, Poch wrote,

"would necessarily render the patient incapable of distinguishing right from wrong or so grossly impair their perception or understanding of reality that they would be incapable of forming a culpable mental state. These disorders could and often

do, however, place the patient under substantial duress which can negatively impact their emotional state as well as their capacity to appreciate the full consequences of their behaviors."

Poch's report did not mention the possible effect of Oliver's mental disorders on his capacity to be truthful during police interrogation, but defense counsel's intention to use the expert testimony to question the credibility of Oliver's confession was clear from counsel's written response to the State's motion in limine.

The district court heard argument on the State's motion, first inviting defense counsel to proffer further particulars of the anticipated expert testimony. Defense counsel declined to say anything more about the content of the testimony beyond what had already been disclosed in Poch's report and the response to the motion in limine. The State argued that the post-traumatic stress disorder diagnosis, to the extent it arose out of the crimes, was irrelevant. As to the dependent personality disorder diagnosis, the prosecutor characterized any testimony regarding Oliver's credibility as invading of the province of the jury. In the alternative, the prosecutor argued, if the court decided to allow the testimony out of an abundance of caution because of the capital charges, the testimony should be limited to the existence of the dependent personality diagnosis and the disorder's tendency, as its name implies, to make Oliver dependent on others.

Defense counsel then responded:

"Frankly, Your Honor, . . . if you're going to side with what [the prosecutor] was saying at the end of his argument and allow us to put the doctor up to say he has these diagnoses, you might as well exclude the evidence altogether, because it doesn't do us any good at all. We need to particularize how those diagnoses affect the confession, or the evidence is just floating around in vapor, doesn't help us. I mean, it doesn't help us explain what happened in this case. It doesn't help us to develop any sort of exculpatory theory."

The district court granted the State's motion in limine, emphasizing that the interrogation of Oliver had been videotaped and that the jury would therefore have ample opportunity to view Oliver's and the investigating officers' behavior. The judge regarded *Crane*, 476 U.S. 683, as distinguishable:

"The psychological environment discussed in *Crane* is best defined by evidence of duress, coercion, trickery, deceit inflicted upon a defendant by law enforcement in order to extract a confession from an otherwise silent defendant or one proclaiming innocence.

". . . [T]he psychological environment contemplated by *Crane* is behavior on the part of law enforcement tending to show that a defendant's free and independent will was overcome by illegal law enforcement tactics. The evidence proposed by the defendant in this case is not of that nature."

Defense counsel later made a proffer of the excluded evidence during the instructions conference. He said:

"As the Court knows, Dr. Poch has diagnosed Mr. Oliver with two mental disorders, one is post-traumatic stress disorder, the other is dependent personality disorder. His rationale for those diagnoses is contained in the report that we're submitting with this proffer.

"He says that the characteristics of PTSD are present in Mr. Oliver, this disorder would impair his judgment and weaken his emotional responses. It could impact what Mr. Oliver would say in the confession, according to Dr. Poch.

"To make this analogy, he, Dr. Poch, refers to military studies of soldiers who are badly traumatized. He concludes that those soldiers are more likely to make false statements to military tribunals. He says this military code of conduct, the entire military code of conduct is based on the psychological research.

"The conclusion in that code of conduct and from this psychological research is that those who suffer from PTSD are unreliable, will say things intended to remove them from the stressful environment of interrogation. He would not testify that is true of every person who is afflicted with this illness, but he says that is—that increases the likelihood of an unreliable statement.

"He also says the military spent millions of dollars studying this very problem and concluded that prior traumatic experiences and inter—as manifested in interview conditions like those in this case will often lead to an unreliable confession. Accused will simply say he did things that he didn't do.

"The second diagnosis of dependent personality disorder, Dr. Poch says this would explain, among other things, Mr. Oliver's demeanor during the—which somewhat flat affect during the—during interrogation, and his behavior about things like why he wouldn't run away after the murders from Earl Bell, he says this diagnosis is corroborated by his interview, Dr. Poch's interviews of other witnesses.

"He says that—Dr. Poch says that this can offer an explanation for why Mr. Oliver would confess to something he didn't do. People with this disorder are more vulnerable to suggestions of responsibility than other interviewees.

"Dr. Poch also says that if in an environment and—interrogation environment where the defendant was at all being led along would be—was given facts about

the crime and asked to confirm or deny them, this would also exacerbate the problem.

"Additionally, people with this disorder are more likely to try to obtain relief from an interrogation environment that they would consider very stressful. And that this dependent personality might explain why Mr. Oliver would confess to crimes that he didn't commit.

"Dr. Poch's—Dr. Poch's opinion, people in his situation with his mental defect may well say virtually anything to get themselves out of the interrogation room.

"What Dr. Poch would testify to in—in conclusion is that—that what could probably happen, given these diagnoses, was that there would be a high probability that Cornelius Oliver was giving untrue information, which diminishes the reliability of the confession."

Also at the instructions conference, the defense requested instructions on felony murder, lesser included offenses of capital and first-degree murder, and compulsion. The district court judge gave lesser included instructions on first-degree premeditated and felony murder on each of the capital charges and instructed on felony murder as an alternative on the first-degree premeditated murder charge. The judge denied the defense requests for instructions on still lesser included offenses and rejected the compulsion instruction.

The jury convicted Oliver of first-degree premeditated murder in the killings of the two men, Levy and Williams, and of felony murder in the killings of the two women, Ford and Wheaton. The district court sentenced Oliver to two consecutive hard 50 sentences on the first-degree premeditated murder convictions and to two consecutive life sentences on the two felony-murder convictions.

### Probable Cause for Arrest

The parties do not dispute which facts were known to police officers at the time of Oliver's arrest, but Oliver argues those facts were insufficient to supply probable cause for a warrantless seizure of his person. As a result, he contends, his confession should have been suppressed as a fruit of the illegal arrest. See *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). Appellate review of a question of law is unlimited. See *State v. Boyd*, 275 Kan. 271, Syl. ¶ 2, 64 P.3d 419 (2003) (where facts

material to decision on motion to suppress not in dispute, question one of law).

K.S.A. 2004 Supp. 22-2401(c)(1) provides that a police officer may arrest a person if "[t]he officer has probable cause to believe that the person is committing or has committed . . . [a] felony." If a warrantless arrest is challenged by a defendant,

"the burden is on the State to justify the arrest was not only authorized by the statute, but that it was permissible under the Fourth Amendment to the United States Constitution. The constitutional validity of a warrantless arrest depends on whether the arresting officer had probable cause to believe that the person arrested had committed a felony." *State v. Aikins*, 261 Kan. 346, Syl. ¶ 2, 932 P.2d 408 (1997).

This court has defined probable cause as the reasonable belief that a specific crime has been committed and that the defendant committed the crime. *State v. Abbott*, 277 Kan. 161, 164, 83 P.3d 794 (2004). "Because probable cause does not require evidence of every element of a crime, it must not be confused with proof beyond a reasonable doubt of guilt." *Abbott*, 277 Kan. at 164. However, probable cause goes beyond mere suspicion. *State v. Mayberry*, 248 Kan. 369, 376, 807 P.2d 86 (1991).

This court considers the totality of the circumstances to determine whether probable cause existed. This includes "all of the information in the officer's possession, fair inferences therefrom, and any other relevant facts, even if they may not be admissible on the issue of guilt." *Abbott*, 277 Kan. at 164.

In addition, this court considers two factors when evaluating a warrantless arrest: "the seriousness of the alleged offense and the exigency of the situation, as where immediate arrest seems desirable because of the likelihood that the suspect will flee the jurisdiction." *Aikins*, 261 Kan. 346, Syl. ¶ 5.

There can be no question in this case that the crimes were very serious. The defense argues, however, that Oliver was arrested without attempting to flee. The State responds that Oliver tried to walk away from his brother's front porch.

Regardless of whether Oliver's departure from the porch can be interpreted as an attempt to flee, the police possessed other evidence against him at the time of his warrantless arrest. The police

knew that Wheaton had been Oliver's girlfriend; that their romance had a violent history, including gunfire; that Oliver had threatened to kill Wheaton with a gun and had injured her shortly before the murder; that Oliver had vowed to "get" those helping Wheaton; that Oliver had stolen Wheaton's car; that an anonymous person at the scene of the murders had handed an officer a note with defendant's name on it; that Oliver was in a gang, and Jermaine Levy was in a rival gang; that .380 shells were found at the crime scene; and that a .380 shell was found at a house with which Oliver had an association.

We have previously upheld warrantless arrests when law enforcement had similar evidence.

In *Aikins,* a case charging felony murder of a liquor store attendant, this court held there was sufficient probable cause for arrest where evidence revealed: A witness testified she saw "a car, fitting the description of [the defendant's] car, pull up to the side of the strip mall where the liquor store was located." *Aikins,* 261 Kan. at 355. The witness saw a person jump out of the car, run into the store, and run out. A friend of the defendant gave a similar description of the defendant's car. She also stated that the car was used in the robbery and murder, and that the triggerman was staying in an apartment rented in the defendant's name.

This court also held that the police had sufficient probable cause for the arrest of a suspect for the murder of his girlfriend when evidence revealed: The suspect lived with the victim part-time; the police knew that the suspect and the victim had fought the day before the murder and that the suspect had previously been convicted of the murder of a girlfriend; and the victim's daughter accused the suspect of the killing. *Mayberry,* 248 Kan. at 377.

Considering all of the information in the possession of the police in this case and other circumstances—such as Oliver's failure to surface to inquire about Wheaton, law enforcement's reasonable apprehension that he might leave Wichita, and the seriousness of the crimes under investigation—we are satisfied that Oliver's warrantless arrest met both the statutory and the constitutional standards. Because we find no error in denying suppression of the

confession that followed Oliver's arrest, we do not reach the State's alternative argument that the confession was sufficiently attenuated from the arrest to be admissible.

*Expert Testimony on Psychological Disorders and Defendant's Credibility*

Oliver's next issue on appeal concerns the exclusion of Poch's expert testimony about psychological disorders that could have led Oliver to confess falsely. The proffered evidence included Oliver's diagnosis of post-traumatic stress disorder arising from witnessing the crimes and a diagnosis of dependent personality disorder. If permitted to testify, Poch also would have said that these diagnoses resulted in a "high probability" that Oliver gave untrue information in his confession. In other words, the testimony would have gone to Oliver's credibility at the time of his confession, not to the voluntariness of that confession. Oliver contends that granting the State's motion in limine to exclude his expert evidence violated the Sixth and Fourteenth Amendments and that the testimony was admissible under K.S.A. 60-456.

An appellate court generally reviews a trial court's decision on a motion in limine under an abuse of discretion standard. *State v. Abu-Fakher*, 274 Kan. 584, 594, 56 P.3d 166 (2002). However, our first question when examining a district court's admission or exclusion of evidence is relevance. "Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question." *State v. Carter*, 278 Kan. 74, 77, 91 P.3d 1162 (2004); see also *State v. White*, 279 Kan. 326, 341, 109 P.3d 1199 (2005) (applying de novo standard to reverse exclusion of expert psychological testimony regarding mental disease or defect; evidence admissible under K.S.A. 22-3220; because evidence integral part of theory of defense, exclusion violated fundamental right to fair trial).

It is obvious that evidence going to the credibility to be afforded a defendant's confession is relevant. Beyond that, a district court's decision on the evidentiary issue in this case should be informed by K.S.A. 60-456 and K.S.A. 22-3215.

K.S.A. 60-456 reads in pertinent part:

"(b) If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness.

. . . .

"(d) Testimony in the form of opinions or inferences otherwise admissible under this article is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact."

Oliver is correct that Poch's proffered testimony met the criteria set forth in these portions of K.S.A. 60-456. It was based on facts personally known to the witness and within the scope of his special knowledge. Moreover, although the credibility to be afforded Oliver's confession would have had a direct impact on the jury's consideration of the ultimate issue of his guilt or innocence, K.S.A. 60-456(d) makes it clear that exclusion was not necessitated on that basis.

Our statutory analysis does not end there, however. We next must turn to K.S.A. 22-3215, which addresses confessions in criminal cases. K.S.A. 22-3215(5) provides:

"The issue of the admissibility of the confession or admission shall not be submitted to the jury. The circumstances surrounding the making of the confession or admission may be submitted to the jury as bearing upon the credibility or the weight to be given to the confession or admission.

In other words, "[t]he truth or falsity of a confession need not be considered by the trial court in determining its voluntariness." *State v. Harwick*, 220 Kan. 572, 575, 552 P.2d 987 (1976). The determination of a confession's truth or falsity is a question left to the jury at trial. A district judge has discretion to decide whether to admit evidence regarding the circumstances surrounding the making of the confession. See K.S.A. 22-3215(5) (such evidence *may* be submitted to the jury). We therefore review the district judge's decision not to admit Poch's testimony regarding Oliver's diagnoses and their potential for affecting his reaction to interrogation under an abuse of discretion standard.

We must apply a different standard to the district judge's decision on whether to admit Poch's further testimony that there was a "high probability" Oliver lied during his confession. Our standard on that issue is de novo. See *State v. Elnicki*, 279 Kan. 47, 53, 105 P.3d 1222 (2005). A judge who permits one witness to opine on the credibility of another witness errs as a matter of law; credibility judgments are within the exclusive province of the jury. *Elnicki*, 279 Kan. at 53.

Under this standard, the district judge in this case did not err in refusing to admit Poch's testimony that Oliver's psychological conditions meant there was a "high probability" Oliver lied in his confession. The district judge would have erred in reaching the opposite conclusion.

· Whether the district judge abused his discretion in excluding the Poch testimony that stopped short of a credibility judgment requires further discussion.

Oliver urges us to draw an analogy between his case and the United States Supreme Court decision in *Crane*, 476 U.S. 683, and our opinion in *State v. Kleypas*, 272 Kan. 894, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002). He also cites *United States v. Adams*, 271 F.3d 1236, 1245 (10th Cir. 2001), for the proposition that such testimony may be allowed in some circumstances, and distinguishes *State v. Cobb*, 30 Kan. App. 2d 544, 43 P.3d 855, *rev. denied* 274 Kan. 1115 (2002). We also consider the effect, if any, of our recent decision in *State v. Swanigan*, 279 Kan. 18, 106 P.3d 39 (2005).

In *Crane*, the defendant, Major Crane, was interviewed about a service station robbery. During the interview, he confessed to his involvement in that crime as well as many others. The police then questioned him about a robbery and shooting at a local liquor store that resulted in the store clerk's death. Crane confessed to that crime as well.

At a later suppression hearing, Crane claimed he had been coerced into confessing falsely. The court denied his motion to suppress, and Crane attempted to argue at trial that his confession should not be believed, based on the confession's inconsistency with details of the crime and the "very circumstances surrounding

the giving of the [confession and] . . . [i]n particular, . . . evidence bearing on the length of the interrogation and the manner in which it was conducted." 476 U.S. at 685. The district court refused to admit evidence of the circumstances of the interrogation.

The United States Supreme Court held:

"[T]he physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. Confessions, even those that have been found to be voluntary, are not conclusive of guilt. . . . Indeed stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?" 476 U.S. at 689.

The Court went on to state that "evidence about the manner in which a confession was obtained is often highly relevant to its reliability and credibility." 476 U.S. at 691. For Crane, "introducing evidence of the physical circumstances that yielded the confession was all but indispensable to any chance of [his defense] succeeding." 476 U.S. at 691. Accordingly, the court ruled that a blanket exclusion of testimony regarding the circumstances of the confession denied the defendant a fair trial. 476 U.S. at 691.

*Crane* plainly supports Oliver's general argument that a criminal defendant ordinarily should be permitted to introduce evidence of the circumstances surrounding a confession arising from interrogation by law enforcement. As Oliver recognizes in his brief, this holding is equivalent to the language of the second sentence of K.S.A. 22-3215(5). Although *Crane* dealt with factors exterior to the defendant rather than with the defendant's psychological makeup, we do not agree with the State that this is a distinction with a meaningful difference. The principle is the same in both situations.

We recognized this principle in *Kleypas*. In that case, we examined the applicability of *Crane* when the defendant had been permitted to challenge the reliability of his confession by introducing evidence from two experts regarding "confabulation." Confabulation is an automatic process through which "one who has

little or no memory of events occurring because of a blackout will gather information from outside sources to fill in the gaps in memory." 272 Kan. at 916.

Defendant Gary Kleypas argued that he should have been permitted to introduce expert testimony that he experienced a blackout on the night of the murder in question, that his memory of events was therefore impaired, and that the information he related in his confession while under interrogation was at least in part supplied by law enforcement officers. 272 Kan. at 916. The district court had denied Kleypas that opportunity, seeing evidence regarding a blackout on the night of the murder as an attempt to evade the notice and other requirements of K.S.A. 22-3219, the statute regulating defenses based on mental disease or defect. 272 Kan. at 917-18.

We distinguished the type of defense asserted by Kleypas—a temporary blackout caused by alcohol, chronic cocaine use, and organic brain damage—from an insanity or mental disease or defect defense and held the district court erred in refusing to admit the expert testimony regarding Kleypas' blackout on the night of the murder. We nevertheless held that the exclusion was harmless error.

"While Kleypas claims that the exclusion of testimony concerning his blackout on the night of the murder denied him the right to present his defense, he was able to show that he had been drinking before the crimes, that there was evidence of extensive cocaine use prior to the night of the murder, and that he suffered from organic brain damage, all of which increased his chances of a blackout and the likelihood that the confession was the product of confabulation. When this evidence is considered with the testimony of [the experts], it becomes clear that Kleypas was given the opportunity to convince the jury that his confession was in part confabulated. The limitations imposed by the court did not, in our opinion, prevent Kleypas from presenting his theory of defense to the jury, and we are able to conclude beyond a reasonable doubt that the error had little if any effect on the outcome." 272 Kan. at 923.

This case differs from *Kleypas* in that confabulation is reflexive; when certain conditions are met, it requires no exercise of the defendant's will to produce a falsehood. Here, Oliver sought to introduce psychological testimony on why he might have lied deliberately. Kleypas does, however, implicitly approve the practice

of permitting a criminal defendant to attack the credibility of his or her earlier confession by introducing expert psychological evidence of the defendant's condition at the time of the confession.

*Adams*, 271 F.3d 1236, the Tenth Circuit case cited by both parties, is less helpful to Oliver. It involved a defendant charged with possession of a firearm by a felon, who made a series of incriminating statements immediately after arrest. He sought to introduce the report of an expert psychologist which addressed his mental condition and education, factors that could be considered in judging the truthfulness of the incriminating statements. *Adams*, 271 F.3d at 1240.

The *Adams* panel first rejected the defendant's effort to have de novo rather than abuse of discretion review applied to the issue. Like Oliver here, the *Adams* defendant asserted that his constitutional right to present his theory of defense had been violated. The panel disagreed, distinguishing the fundamental right to present a defense from a right "that is not fundamental, the right to present that theory in whatever manner and with whatever evidence he chooses." *Adams*, 271 F.3d at 1243.

In addition, because the report had been excluded on a valid procedural basis—its untimely disclosure, the panel agreed with the district court's exercise of its discretion. In terms of substance—the panel also concurred with the district court in spite of *Crane*. The *Adams* defendant claimed that he had lied to protect a girlfriend—much like Oliver's assertion here that he protected Bell. As the panel observed in *Adams*, this is "precisely the type of explanation that a jury is capable of resolving without expert testimony." *Adams*, 271 F.3d at 1246.

Oliver is more persuasive in distinguishing *Cobb*, 30 Kan. App. 2d 544. In that case, defendant Artis Cobb confessed to participating in the murders of Kasey Blount and her daughter, Alannah. At trial, the district court admitted expert testimony regarding the phenomenon of false confessions induced by the interrogation methods used on Cobb. The State argued that the admission of that evidence constituted an abuse of discretion, and the Court of Appeals panel agreed. 30 Kan. App. 2d at 564-67. It is clear that *Cobb* did not deal with the particular psychological makeup of the

defendant or with the potential for interaction between that makeup and interrogation techniques used by law enforcement. It dealt only with the techniques themselves.

Likewise, our recent decision in *Swanigan,* 279 Kan. 18, is distinguishable. In that case, defendant Jami Del Swanigan challenged the district court's rejection of his motion to suppress his statements to law enforcement as involuntary. We reversed in part because the district judge failed to consider Swanigan's low intellectual functioning and a defense expert's report and testimony regarding Swanigan's susceptibility to being overcome by anxiety during interrogation. Here, we are not concerned with a judge's voluntariness evaluation but rather a jury's credibility determination. However, Swanigan, like Kleypas, demonstrates that this court has recognized the potential for psychological factors to influence the dynamics of an interrogation.

Oliver also directs our attention to cases from other jurisdictions, both federal and state. See *United States v. Hall,* 93 F.3d 1337, 1342-45 (7th Cir. 1996) (conviction reversed because trial judge failed to correctly employ *Daubert* analysis, Federal Rule of Evidence 702 to evaluate admissibility of expert testimony on false confessions and personality disorder; such testimony may assist the jury, give reason to reject "common sense" conclusion regarding facts); *United States v. Shay,* 57 F.3d 126, 131-34 (1st Cir. 1995) (rejecting wholesale exclusion under Federal Rule of Evidence 702 of expert testimony on defendant's "psuedologia fantastica" disorder, which involves a compulsion to invent stories); *Beagel v. State,* 813 P.2d 699, 706-07 (Alaska App. 1991) (psychiatrist should have been permitted to testify regarding defendant's confabulation caused by psychogenic amnesia); *People v. Lopez,* 946 P.2d 478, 484 (Colo. App. 1997) (psychologist should have been permitted to testify regarding circumstances surrounding defendant's confession); *McIntosh v. State,* 532 So. 2d 1129, 1130-31 (Fla. Dist. App. 1988) (testimony regarding drug addiction, mother's dominance should have been admitted); *Holloman v. Commonwealth,* 37 S.W.3d 764, 767-68 (Ky. 2001) (expert should have been permitted to testify on effect of mental retardation on ability to understand, communicate); *State v. Buechler,* 253 Neb. 727, 739,

572 N.W.2d 65 (1998) (court should have admitted proffered testimony regarding drug withdrawal, psychological disorders; testimony "undertook not to tell the jury how to decide the case or what result should be reached on any issue to be resolved by it, but, rather, to explain [defendant's ] mental state at the time of the recorded confession"); *State v. Stringham*, 2003 WL 950957 (Ohio App.) (error to exclude testimony on possible impact of psychotypal personality disorder on defendant's reliability); *State v. Wallen*, 1995 WL 702611 (Tenn. Crim. App.) (on remand, trial court should consider admitting psychologist's testimony regarding defendant's mild mental retardation and poor reading comprehension); *Pritchett v. Commonwealth*, 263 Va. 182, 186-87, 557 S.E.2d 205 (2002) (error to disallow general expert psychological testimony regarding mild retardation resulting in tendency of defendant to be compliant, vulnerable to suggestion); *State v. Miller*, 1997 WL 328740 (Wash. App.) (social psychologist should have been permitted to testify generally on "why some people may confess to crimes they did not commit").

For its part, the State responds that other jurisdictions are not uniformly in favor of admitting expert testimony on the effect a defendant's psychological status may have on his or her confession. See *Turtle v. State*, 520 S.E.2d 211, 213-14 (Ga. 1999) (trial court's exclusion of testimony that defendant exhibited symptoms of bipolar disorder, displayed tendency to grandiose fabrications correctly excluded; jury capable of judging credibility without expert's input); *Bixler v. State*, 582 N.W.2d 252, 255-56 (Minn.), *cert. denied* 525 U.S. 1056 (1998) (no abuse of discretion in disallowing psychological expert testimony on low intelligence, vulnerability to suggestion; jury capable of "observing and understanding [defendant's] propensity to please authority figures"); *State v. Loza*, 71 Ohio St. 3d 61, 65-66, 641 N.E.2d 1082 (1994) (clinical psychologist's testimony that defendant's background, psychological makeup, personal code of conduct prohibiting "snitching" properly excluded; *Crane* distinguished).

Our reading of the clear majority of the cases from other jurisdictions reveals that most would allow experts to testify generally regarding a defendant's mental condition and the likelihood of a

person with a similar mental condition to give unreliable information. However, most of these cases either explicitly or implicitly limit such testimony to the theoretical or hypothetical; they would draw the line at permitting an expert to express a specific judgment or opinion on the credibility of the defendant's particular confession in the case at bar. See, *e.g.*, *Hall*, 93 F.3d at 1342-45 (proffer discussed expert's theoretical testimony only); *Shay*, 57 F.3d at 133-34 (case reversed, remanded to determine whether testimony should be excluded for another reason, otherwise limited); *United States v. Hall*, 974 F. Supp. 1198, 1205 (C.D. Ill 1997) (decision on remand from Seventh Circuit; expert's testimony admissible only to show correlation between false confessions and certain coercive police techniques but not "about matters of causation, specifically, whether the interrogation methods used in this case caused [the defendant] to falsely confess"); *Stringham*, 2003 WL 950957 (observing "expert witness may not render a personal opinion as to whether a particular witness is telling the truth," testimony at issue would not have provided expert's opinion about whether defendant's confession reliable, would only better enable jury to evaluate reliability); *Jackson v. Commonwealth*, 266 Va. 423, 438-39, 587 S.E.2d 532 (2003) (expert's testimony on transference as phenomenon making subject more prone to suggestion found admissible; however, no error to exclude expert's testimony on truth or falsity of defendant's statements); *Pritchett*, 557 S.E.2d at 207-08 (allowable testimony limited to hypothetical effect of mental retardation; expert may not testify defendant "just went along with what they said"); *Miller*, 1997 WL 328740 (expert testimony would be limited to "general discussion of false confessions"). The one exception appears to be the Alaska Court of Appeals decision in *Beagel*, 813 P.2d at 707-08, where the defendant's proffer of psychiatric testimony included the witness's anticipated statement: "I believe this is exactly what Mrs. Beagel did at the times that she was recorded on the tapes [of her incriminating statements]." Because the *Beagel* decision is among the earlier cases and is short on analysis when compared to the decisions from other jurisdictions, we are not inclined to accept its approach. We agree with the majority of the jurisdictions, which have recognized that allow-

ing an expert to say that a defendant's mental condition specifically caused him or her to lie when confessing is a forbidden invasion of the jury's province.

We also observe that, as demonstrated by *Adams*, other jurisdictions hold expert testimony on a defendant's tendency toward false confessions would be inadmissible when the testimony actually would offer little help to the jury. See, *e.g.*, *Adams*, 271 F.3d at 1246; *Maine v. MacDonald*, 718 A.2d 195, 198 (Me. 1998) ("[T]he court reasonably could have concluded that [the expert's] testimony would do little more than reinforce a concept already well within the jurors' grasps, namely, that people sometimes lie to protect those close to them.").

With all of these authorities in mind—*Crane*, Kansas statutes and precedents, and cases from other jurisdictions that have considered the question—we hold that a criminal defendant against whom a confession will be admitted may be permitted to introduce expert psychological or psychiatric testimony bearing on his or her ability to respond reliably to interrogation. It is essential, however, that the testimony actually tell jurors something they would not otherwise know from their usual human experience and that it remain hypothetical·or theoretical. It must stop short of expressing the expert's judgment on the defendant's reliability in the specific instance of the confession submitted for the jury's consideration.

We have purposely stated this holding permissively. A district judge may allow such evidence, but there may be independent reasons that are perfectly valid for disallowing it. The appellate standard of review remains abuse of discretion under K.S.A. 22-3215(5). See also *Crane*, 476 U.S. at 689 ("Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.' ").

Here, the district judge's refusal to admit Poch's testimony did not amount to an abuse of discretion. The defense did not seek to admit the testimony until Oliver's trial was under way. Poch's written report was vague; it was not until defense counsel responded to the State's motion in limine that the purpose of the testimony

could be fairly understood. At argument on the State's motion in limine, defense counsel initially declined to provide additional particulars. He was somewhat more expansive in response to the State's assertion that the expert testimony should be limited to avoid interference with the jury's role as credibility evaluator, stating that such a limitation would make the evidence useless to the defense. Finally, a more complete proffer, including the unacceptable "high probability" language, was made at the instructions conference.

Under these circumstances, the district judge reasonably resisted the defendant's late-blooming, all-or-nothing demand to admit Poch's testimony. There was no error, and we need not reach the question of harmlessness.

### Instructions on Lesser Included Offenses

At trial, Oliver's counsel requested instructions on second-degree murder and voluntary manslaughter as lesser included offenses. The district court denied defendant's request, finding that the inclusion of defendant's requested instruction on felony murder eliminated the need to give the lesser included offense instructions. The district court relied on *State v. Williams*, 263 Kan. 134, Syl. ¶ 1, 947 P.2d 25 (1997), which stated: "If the evidence of the underlying felony [is] strong, no instruction on the lesser included offenses [is] required."

Because defendant "requested the instructions, this court must review the matter in a light most favorable to" defendant. See *State v. Hoge*, 276 Kan. 801, 805, 80 P.3d 52 (2003).

"If the defendant requests the instructions, the trial court has a duty to instruct the jury regarding all lesser included crimes that are established by the evidence, regardless of whether the evidence is weak or inconclusive. [Citations omitted.] An instruction on a lesser included crime, however, is not required if the jury could not reasonably convict the defendant of the lesser crime based on the evidence presented. [Citations omitted.]" *Hoge*, 276 Kan. at 805.

K.S.A. 2004 Supp. 21-3402 defines second-degree murder as "the killing of a human being committed: (a) Intentionally; or (b) unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life."

K.S.A. 21-3403 defines voluntary manslaughter as "the intentional killing of a human being committed: (a) upon a sudden quarrel or in the heat of passion."

The difference between first-degree and second-degree murder is premeditation. Premeditation can be inferred from " ' "(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless." ' " *Hoge*, 276 Kan. at 806 (quoting *State v. Murillo*, 269 Kan. 281, 286, 7 P.3d 264 [2000]).

Here, Oliver takes issue with the district judge's conclusion that the inclusion of felony-murder instructions meant additional lesser included instructions were unnecessary. Oliver relies on *State v. Boyd*, 216 Kan. 373, 376-77, 532 P.2d 1064 (1975), in which this court reversed a conviction for failure to instruct on the lesser included offenses of premeditated murder even though the only evidence to support the defendant's theory was the defendant's testimony.

The State claims that the evidence did not support instructions on these lesser included offenses and that the *Boyd* decision is dated. The State asserts that this court should rely on its more recent decision in *State v. Chism*, 243 Kan. 484, 759 P.2d 105 (1988), which held: "If the undisputed evidence [of the underlying felony] is not weak or inconclusive, but instead would convince a reasonable person that a felony had been committed, instructions on lesser offenses are not required." 243 Kan. at 487. The State also distinguishes this court's more recent decision *State v. Hoge*, 276 Kan. at 805.

In *Hoge*, the defendant was charged with alternative counts of first-degree premeditated murder and felony murder for the death of Ivan Winn. The members of the jury returned a guilty verdict for first-degree murder under the combined theories because they were unable to reach a unanimous verdict. This court decided that whether the lesser included offense instructions should have been given had to be decided by analyzing each of the alternative theories of first-degree murder individually. *Hoge*, 276 Kan. at 805.

The instructions were not required under the felony-murder theory because there was sufficient evidence of the underlying felony. *Hoge*, 276 Kan. at 805. Under the premeditated murder theory, the instructions were unwarranted because the evidence supported an inference of premeditation. *Hoge*, 276 Kan. at 806-07.

In this case, Oliver was charged with first-degree premeditated murder of Levy and with capital murder of Williams, Ford, and Wheaton. On Levy's murder, the jury was instructed on both theories of first-degree murder, premeditated and felony; it convicted Oliver of first-degree premeditated murder. On each of the three other murders, the jury was instructed on capital murder and both theories of first-degree murder. Oliver was convicted of first-degree premeditated murder in Williams' death and of felony murder in the deaths of Ford and Wheaton. None of Oliver's four convictions is comparable to the conviction at issue in *Hoge*. Oliver's jury was unanimous on one of the theories of first-degree murder on each conviction, rather than convicting on a combined theory.

With regard to the two male victims, Levy and Williams, there was inadequate evidence to require giving either a second-degree murder or voluntary manslaughter instruction. Evidence of premeditation, in contrast, was abundant.

All or nearly all of the factors we have previously enumerated as indicative of premeditation were present. The weapons used were deadly, two guns. The evidence was that the shooter switched guns when one malfunctioned and switched back when the first gun became operational. Even considering Oliver's testimony, there was no evidence of provocation sufficient to support the deadly violence of the shootings. A court is not required to instruct on voluntary manslaughter unless the evidence shows " 'that the heat of passion alleged resulted from severe provocation sufficient to cause an ordinary person to lose control of his or her actions or reason. [Citation omitted.] The provocation must consist of more than mere words or gestures.' " *State v. Bell*, 273 Kan. 49, 51, 41 P.3d 783 (2002) (quoting *State v. Evans*, 270 Kan. 585, 588, 17 P.3d 340 [2001]). In addition, the evidence regarding the positions of the men's bodies demonstrated that they had not adopted either aggressive or defensive postures before they were shot. Oliver's

behavior before and after the killing—at least one threat toward Wheaton's friends; his inappropriate dress for the December weather, suggesting a desire to conceal the blood on his clothes; his avoidance of contact with the police after the crimes; his statement to police that he would have shot anyone else unlucky enough to be present because "you can't leave witnesses at something like this"—also have a tendency to prove premeditation. Finally, both Levy and Williams sustained more than one wound. Levy had been shot once in the back of the head and once in the neck; Williams had three gunshot wounds to the head. This physical evidence demonstrated that lethal shots may have been fired after the two men were rendered helpless.

With regard to the two female victims, we agree with the State that *Chism* is controlling. There was no need for instructions on second-degree murder or voluntary manslaughter in this case, because the evidence of the underlying felony of aggravated robbery was not weak or inconclusive.

### Instruction on Compulsion

Oliver also argues that the district court committed reversible error by refusing to give an instruction on compulsion. He acknowledges that compulsion is not a defense to murder but argues it should have been a defense to the aggravated robbery, the underlying felony for felony murder. The State contends that evidence to support a compulsion instruction was insufficient.

The district court "must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence." *State v. Williams*, 277 Kan. 338, 356, 85 P.3d 697 (2004). "A defendant is entitled to an instruction on his or her theory of the case even though the evidence thereon is slight and supported only by the defendant's own testimony. [Citation omitted.]" *State v. Bell*, 276 Kan. 785, 792, 80 P.3d 367 (2003). Further, as mentioned, this court reviews the evidence in the light most favorable to the party requesting the instruction when considering the district court's refusal to give a requested instruction. *Williams*, 277 Kan. at 356.

The statute governing the compulsion defense in Kansas states:

"(1) A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believes that death or great bodily harm will be inflicted upon him or upon his spouse, parent, child, brother or sister if he does not perform such conduct.

"(2) The defense provided by this section is not available to one who willfully or wantonly places himself in a situation in which it is probable that he will be subjected to compulsion or threat." K.S.A. 21-3209.

Oliver argues that, when the evidence is viewed in the light most favorable to him, it shows he did not know that Bell was planning to rob anyone at the time he agreed to cooperate with Bell, that Oliver checked Levy's pocket only under duress, and that Bell was holding a gun and directing his actions. He argues therefore that he did not willfully place himself in the situation, and he was afraid his life would be in danger if he did not comply with Bell's directions.

Defendant relies on *State v. Hunter*, 241 Kan. 629, 740 P.2d 559 (1987), in which this court held that it was the jury's function to decide if a defendant was afraid for his or her life, if the fear was reasonable, and if such fear justified a criminal act. "When the trial judge refused the requested compulsion instruction, [the judge] effectively prevented the jury from considering the evidence presented in [defendant's] defense." 241 Kan. at 646.

Although there was some minimal evidence that Oliver was under the influence of Bell, there was no evidence supporting the degree of compulsion necessary to merit an instruction on that defense.

*Hard 50 Sentencing Statute*

Oliver's final argument on appeal is that his hard 50 sentences for each of his premeditated murder convictions pursuant to K.S.A. 2004 Supp. 21-4635 should be vacated because the statute is unconstitutional in light of the United States Supreme Court decision in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). This court has de novo review over such constitutional questions. See *State v. Beard*, 274 Kan. 181, Syl. ¶ 1, 49 P.3d 492 (2002).

We have rejected this argument numerous times and do so again today. See, *e.g.*, *State v. Wilkerson*, 278 Kan. 147, Syl. ¶ 12, 91 P.3d 1181 (2004); *State v. Hebert*, 277 Kan. 61, 107-08, 82 P.3d 470 (2004).

Affirmed.

GERNON, J., not participating.