NOT DESIGNATED FOR PUBLICATION

No. 114,188

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JUAN AGUIRRE,
*Appellee*,

v.

STATE OF KANSAS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Finney District Court; MICHAEL L. QUINT, judge. Opinion filed September 9, 2016.
Affirmed.

*Tamara S. Hicks*, assistant county attorney, *Susan Lynn Hillier Richmeier*, county attorney, and
*Derek Schmidt*, attorney general, for appellant.

*Stephen M. Patton*, of Kansas City, Missouri, for appellee.

Before LEBEN, P.J., PIERRON and MCANANY, JJ.

*Per Curiam*: Juan Aguirre was tried and convicted of rape, aggravated indecent
liberties with a child, and aggravated intimidation of a witness or victim. He received a
controlling sentence of 672 months in prison. His convictions and sentences were
affirmed on appeal. He then sought relief pursuant to K.S.A. 60-1507 based on the claim
that his lawyer at trial had been ineffective in defending him against these claims. The
district court found merit in his contentions and ordered a new trial. The State's appeal
brings the matter to us for review.

1

It was reported to the police that the alleged victim in this case and her brother were being physically abused by their mother and Aguirre, their mother's boyfriend. In the course of investigating these allegations the girl, age 15, told an investigator that Aguirre had been sexually abusing her for several years. She reported that she had sexual intercourse with Aguirre when she was 11 years old. Aguirre told her not to tell anyone or she would get into trouble. She signed a written narrative statement to this effect.

The girl later recanted her accusation, stating that she had lied about Aguirre sexually abusing her because she did not like him because he was too strict with her, always complained about the way she dressed, and would not let her go out when she wanted to. She denied that anyone had pressured her to change her story.

At trial, the girl's initial written statement was admitted into evidence. The girl then testified that she had lied when she accused Aguirre of sex abuse. In response, the State called Dr. Sue Dowd as an expert witness on child sex abuse. More about Dr. Dowd later. Aguirre testified on his own behalf, denying the girl's original allegations and suggesting that she made them up because she was angry at him and did not like him.

After his conviction on all charges, Aguirre appealed to this court where he argued, among other things, that the district court erred in admitting Dr. Dowd's expert testimony. *State v. Aguirre*, 45 Kan. App. 2d 141, 245 P.3d 1 (2011), *aff'd in part and rev'd in part* 296 Kan. 99, 290 P.3d 612 (2012). Aguirre argued that the matters Dowd testified to were within the knowledge of laypersons and did not call for expert testimony. We determined that the issue had not been properly preserved because Aguirre's counsel failed to raise a timely, specific objection at trial. 45 Kan. App. 2d at 151-52. See *State v. King*, 288 Kan. 333, 348, 204 P.3d 585 (2009). Aguirre's convictions

and sentence were affirmed. *Aguirre*, 45 Kan. App. 2d at 154-55, *aff'd in relevant part*, 296 Kan. 99.

Thereafter, Aguirre filed a timely K.S.A. 60-1507 motion alleging that his trial counsel was ineffective for failing: (1) to move to strike for cause or exercise peremptory challenges to prevent two venirepersons from serving on the jury; (2) to object to Dr. Dowd's expert testimony regarding common behavioral characteristics of sexually abused children; and (3) to object to certain "irrelevant, but prejudicial evidence." The parties deposed Aguirre's trial counsel and then stipulated that the district court could decide the matter without an evidentiary hearing based on the court's file, the trial and sentencing hearing transcripts in the underlying criminal case, and trial counsel's deposition testimony. Upon reviewing the record, the district court granted Aguirre's K.S.A. 60-1507 motion and ordered a new trial, finding that Aguirre's trial counsel was ineffective on all three bases asserted by Aguirre. The State appeals.

STANDARD OF REVIEW ON APPEAL

Because no witnesses testified in front of the district court on Aguirre's habeas motion, the parties suggest that our court's review is de novo, owing no deference to the district court. We do not agree, though our differing view on the standard of review has no impact on the outcome of the case.

When a habeas motion under K.S.A. 60-1507 is filed, the district court has three options. First, it may summarily deny the motion if the case records conclusively show the defendant isn't entitled to relief. Second, the court may hold a preliminary, nonevidentiary hearing to determine whether there are issues that require an evidentiary hearing. Third, the court may determine that there are issues requiring an evidentiary hearing—in which case the court holds an evidentiary hearing. *Bellamy v. State*, 285 Kan. 346, Syl. ¶ 1, 172 P.3d 10 (2007).

3

Here, the court obviously determined there were issues requiring an evidentiary hearing; in fact, the court granted relief. The court file tells us that the court held a pretrial conference on the habeas motion, but there's no transcript or docket entry showing the hearing. The district court's written order, however, tells us that the parties "stipulated that the evidence for the evidentiary hearing will consist of the court's file, the trial and sentencing transcript in the underlying case, . . . and the transcript of the deposition of Movant's trial counsel, Mark Marion, taken June 6, 2014."

In sum, the district court held an evidentiary hearing, but only one witness, Mark Marion, presented testimony. That testimony was taken in a deposition before the hearing, a common practice for the convenience of the parties or the witness. Still, an evidentiary hearing was held, so the standard of review is the one we apply in such cases—we determine whether the district court's factual findings are supported by substantial evidence and whether its factual findings are sufficient to support its legal conclusions. *Bellamy*, 285 Kan. 346, Syl. ¶ 5.

In this case, the standard of review doesn't affect the outcome—the evidence is straightforward, and it supports the district court's legal conclusions.

ANALYSIS

Aguirre has the burden to establish that (1) his trial counsel's performance was deficient under the totality of the circumstances, and (2) there is a reasonable probability that the jury would have reached a different result absent his counsel's deficient performance. See *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014).

4

Our scrutiny of counsel's performance is highly deferential and requires consideration of all the evidence before the judge or jury. We start off with the strong presumption that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). To establish prejudice, the defendant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. By "reasonable probability" we mean a probability sufficient to undermine confidence in the outcome of the trial. *Miller v. State*, 298 Kan. 921, 934, 318 P.3d 155 (2014).

If counsel made a strategic decision after making a thorough investigation of the law and the facts relevant to the realistically available options, counsel's decision is virtually unchallengeable. Strategic decisions made after a less than comprehensive investigation are reasonable to the extent that reasonable professional judgment supports the limitation of the investigation. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013) (citing *Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]).

In addition to his conviction for two sex offenses against N.R., Aguirre was also convicted of aggravated intimidation of a witness, again N.R. That charge alleged that Aguirre had prevented or dissuaded N.R. from reporting a crime against her—the abuse committed by Aguirre. See *Aguirre*, 296 Kan. at 102-03. Thus, all three convictions are premised upon Aguirre having committed sex crimes against N.R., and the validity of the underlying sex-crime allegations was central to each of Aguirre's convictions.

We now turn to Aguirre's argument regarding the testimony of Dr. Dowd, a Ph.D. clinical psychologist. In advance of trial, the State moved to endorse Dowd as an additional witness. Aguirre objected. At the pretrial hearing on the matter, the State explained:

"We are going to elicit from [Dowd] expert opinions as to recantations, which is an issue in this case. We believe that it is important for the jury to be educated on the fact that it is common place for people to recant, specifically if they are still in the home where the allegations occurred."

The State apparently did not have a written report setting forth the opinions and bases for the opinions Dowd would express. In fact, Dowd was only one of two possible experts the State might call, depending on the trial date. Defense counsel objected:

"This is a fairly simple case. There is no real need or reason to introduce an expert. . . . [W]e have to have an expert testify as to facts that would not be within the common knowledge of the average juror.

. . . .

"[W]hy a child might change their story after having said something once, is well within the common knowledge of the jurors."

The district court overruled the objection and permitted Dowd to testify, noting that "prior case authority indicates that this type of testimony is fair game or legitimate fodder in a case of this nature."

At trial, Dowd testified that when a child discloses sexual abuse, it typically is not a detailed account of the abuse. The disclosure process is "an ongoing process," and a child's first disclosure is often accidental.

She testified that family dynamics play a huge role in disclosure of child sexual abuse. Often, the child has a loving relationship with the abuser. A child's disclosure is not motivated to get the abuser in trouble but to stop the abuse. A child may feel conflicted about the abuser, causing the child to waiver in the decision to disclose.

According to Dowd, repeated interviewing of a child increases the likelihood of recantation, particularly when the child can no longer handle the gravity of disclosure and the subsequent effects on the child's life.

In her expert opinion, "very few children lie about sexual abuse. It's not something that they make up. A child is more likely to lie when they recant." She testified that a child may be pressured by family members to recant, such as when the child's mother is still romantically involved with the abuser, when the abuser is the financial provider for the family, or when the child faces negative societal attitudes and experiences at school. The child also may be fearful of being removed from the home.

Defense counsel objected to the narrative response of the witness, which the court sustained. Defense counsel raised another objection at the bench but it was not preserved by the court reporter. Whatever the objection was, the court responded: "Objection noted."

Dowd continued, "the one thing about recanting. Um, studies have shown . . . ," and defense counsel objected, "this is not responsive to a question now." The court sustained the objection. The prosecutor then asked: "Could you tell us what you know from your studies?" Dr. Dowd responded:

> "Statistically, the rate on recanting is between four percent and 22 percent, the different studies have shown that.
>> "The strongest studies that I've read are basically 22 percent of children who make allegations recant. 93 percent of the 22 percent who recant, later go on to reaffirm the original allegation. And it's not a hundred percent say that their recanting was a lie, but 93 percent is pretty big."

With that testimony in mind, we turn next to the legal standards for expert opinion testimony, especially in cases involving sexual abuse against children. As a general

7

matter, an expert witness' opinion is only admissible "up to the point where an expression of opinion would require the expert to pass upon the credibility of witnesses or the weight of disputed evidence." *State v. Lumbrera*, 257 Kan. 144, 157, 891 P.2d 1096 (1995). But in cases involving sexual abuse against children, courts have recognized that jurors won't necessarily be familiar with the behaviors abused children might display, so expert testimony is both helpful and allowed.

In *State v. McIntosh*, 274 Kan. 939, 960, 58 P.3d 716 (2002), for example, the court approved of the expert's testimony concerning common patterns of behavior in children who are sexually abused. The expert listed some of the common behaviors among sexually abused children and opined that the alleged victim displayed behaviors consistent with a sexually abused child, though he conceded that these behaviors are also seen in children who have not been abused.

Similarly, in *State v. Reed*, 40 Kan. App. 2d 269, 273-75, 191 P.3d 341 (2008), *rev. denied* 290 Kan. 1102 (2010), our court approved of the expert's testimony to various factors that might cause a child to recant a previous allegation of sexual abuse. The witness did not opine as to whether the child victim in *Reed* shared similar characteristics with a child who would be prone to recant. Similar testimony was elicited from the State's expert in *State v. Reyna*, 290 Kan. 666, 685, 234 P.3d 761 (2010), *overruled on other grounds by State v. Dunn*, 304 Kan. ___, 375 P.3d 332 (2016).

A central issue in the present case is whether the child who accused Aguirre of sexually abusing her was telling the truth when she later recanted her accusation, saying she had accused Aguirre simply because she was mad at him for being so strict around the house. Here, the expert's testimony went beyond the bounds approved in *McIntosh*, *Reed*, and *Reyna*. Dowd did not confine her testimony to the factors that might cause a child to recant an accusation of sexual abuse. First, she quantified the odds of the recantation being a lie when she testified: "A child is more likely to lie when they

8

recant." But she then elaborated that 93 percent of the children who recant "later go on to reaffirm the original allegation. *And it's not a hundred percent say that their recanting was a lie, but 93 percent is pretty big*." (Emphasis added.)

None of this was objected to by defense counsel. Defense counsel does not identify any strategic basis for not objecting.

Dowd holds a Ph.D. in clinical psychology and has been licensed and practicing in Kansas since 2002. She has been working with sexual abuse survivors for the past 15 years. The jury was left with her unchallenged expert testimony that 93 percent of the children who recant accusations of sexual abuse are lying when they recant. The obvious implication for the jury was that there is a 93 percent probability that the child in this case was lying when she recanted her accusation against Aguirre.

When the district court heard arguments on the State's pretrial motion to endorse Dowd as an additional witness, the State did not disclose to the court or to defense counsel that Dowd would opine on the likelihood that the recantation by the child in this case was a lie. Had the State done so, we find it extremely likely that the district court would not have allowed such testimony at trial. Further, when this testimony was presented at trial, we find it extremely likely that the district court would have sustained defense counsel's objection and stricken this testimony if an objection had been raised. And if the district court had not sustained that objection, we would have reversed that ruling on appeal.

While it's perfectly appropriate and helpful to have testimony about the behaviors of children who have been abused or factors that might lead a child to recant, as in *McIntosh* and *Reed*, no witness—expert or otherwise—is allowed to testify about the credibility of another witness, *i.e.*, whether another witness should be believed. See *State v. Crum*, 286 Kan. 145, 151-52, 184 P.3d 222 (2008); *State v. Elnicki*, 279 Kan. 47, 53-

9

54, 105 P.3d 1222 (2005). Based on the balancing of these rules, other courts have reversed convictions when an expert witness gave testimony that tried to quantify the likelihood that a child was telling the truth.

For example, in *Wheat v. State*, 527 A.2d 269 (Del. 1987), an expert testified that while between 30 percent and 40 percent of children recant or otherwise minimize their initial allegation of sexual abuse, fewer than 5 percent recant and maintain their altered position. The Delaware Supreme Court reversed the resulting rape conviction because it said the expert's testimony had "in effect provided a statistical evaluation of the complainant's present veracity," which "impermissibly invaded" the jury's role. 527 A.2d at 274-75. Similarly, in *United States v. Brooks*, 64 M.J. 325 (C.A.A.F. 2007), an expert testified that when a child-sexual-abuse allegation arises outside the context of a divorce case, the rate of false accusations was less than the 2 percent to 5 percent found in divorce cases. The United States Court of Appeals for the Armed Forces reversed the resulting indecent-liberties conviction, finding that "[t]his testimony provided a mathematical statement approaching certainty about the reliability of the victim's testimony." 64 M.J. at 329. See also *State v. Lindsey*, 149 Ariz. 472, 474-75, 720 P.2d 73 (1986) (finding improper an expert's testimony that only a "very small proportion" of incest victims lie, stating that "expert testimony that quantifies the probabilities of the credibility of another witness" is inadmissible); *State v. MacRae*, 141 N.H. 106, 110, 677 A.2d 698 (1996) (finding improper an expert's testimony that between 70 percent and 80 percent of males treated at a particular substance-abuse center had been sexually abused, stating that testimony "improperly provided statistical evidence that the victim more probably than not had been abused"); *State v. Gokey*, 154 Vt. 129, 137-38, 140, 574 A.2d 766 (1990) (finding improper an expert's testimony repeating precisely what child had told her, stating child could distinguish truth from falsehood, and remarking on child's "victimization," stating that expert had "impermissibly cloaked the child's testimony with a favorable expert opinion, imbued with scientific respectability and reliability").

In Aguirre's case, without an objection, the jury was told by an expert in the field of child sex abuse that there was a 93 percent chance that the child witness was lying when she testified that her accusations against Aguirre were untrue. That expert testimony should have been inadmissible, and Aguirre's attorney should have objected to it.

Accordingly, the district court did not err in finding that Aguirre's trial counsel should have objected to this testimony and that Aguirre was prejudiced thereby. This was essentially a he-said-she-said case. The State does not point to independent evidence that Aguirre was sexually abusing his girlfriend's daughter. Allowing an expert witness to testify that there was a 93 percent statistical probability that the child lied when she recanted her testimony undermines our confidence that the jury made its own independent determination of the credibility of the child witness. Without that independent credibility determination, we conclude that there was a reasonable probability that the outcome of the trial would have been different. Accordingly, we affirm the district court's order for a new trial.

Because the district court properly ordered a new trial in this case, the State's other objections to the district court's findings are now moot, and we need not address them.

We close our opinion by noting that courts do not lightly set aside a jury's verdict. Nor do we lightly require that witnesses in an emotionally difficult case testify a second time. But Aguirre was sentenced here to more than 50 years in prison on these convictions, and we also recognize that no one can—or should—be sent to prison in the United States unless he or she has received a fair trial in compliance with constitutional requirements. See *State v. Jackson*, 39 Kan. App. 2d 89, 100, 177 P.3d 419 (2008). One of those requirements, representation by counsel that meets minimum standards, was not met here.

We therefore affirm the district court's judgment.

* * *

MCANANY, J., concurring:  I agree with the analysis and conclusions reached by the majority in this case. I write separately to raise an issue about the standard of review we apply in considering the ruling of the district court, although, as the majority points out, it has no effect on the outcome of the case.

The majority relies on *Bellamy v. State*, 285 Kan. 346, 350-353, 172 P.3d 10 (2007), in concluding that we review the district court's decision to determine if substantial evidence supports its findings of fact. The majority's analysis on this issue is consistent with the holding in *Bellamy*, and the decision in *Bellamy* has often been cited in decisions by our court (me included) as the appropriate standard of review. *Bellamy* describes three scenarios for the district court:  summary proceedings, preliminary hearings, and full evidentiary hearings. It seems to me that Aguirre's appeal falls between the cracks.

In *Telegram Publishing Co. v. Kansas Dept. of Transportation*, 275 Kan. 779, 784, 69 P.3d 578 (2003), the court stated:

> "The Court of Appeals concluded that because the district court heard no oral testimony and the controlling facts were based on written or documentary evidence appellate review was plenary. We agree."

This makes perfect sense. On appeal, we consider the facts based on the cold record without having seen the witnesses who testified at the trial or hearing and without being in a position to appraise their credibility. On matters of credibility, we defer to the trial judge who saw the extended pause between question and answer, the posture of the

12

witness, and the multitude of physical signs we all take into account in weighing the credibility of a person who stands before us. The record discloses to an appellate court none of this.

In *Laymon v. State*, 280 Kan. 430, 437, 122 P.3d 326 (2005), the court considered the standard of review in summary proceedings on a K.S.A. 60-1507 motion and stated:

> "[T]o the extent a decision is based only upon the 'motion, files, and record' of a case, an appellate court is as equipped as a district court to decide the issues efficiently and reliably, and both this court and the Court of Appeals routinely engage in de novo review of summary denials of 60-1507 motions."

*Bellamy* recognized this fact and applied a de novo review standard when a 60-1507 motion is summarily dismissed. Citing *Laymon*, the court in *Bellamy* stated: "We see no reason for the appellate court to give any deference to the district court's factual findings under this option because an appellate court has the same access to the motion, records, and files as the district court." 285 Kan. at 354.

At the preliminary hearing stage, the *Bellamy* court noted that "the district court may admit limited evidence and consider arguments of counsel." 285 Kan. at 354. It is not clear whether the "limited evidence" is confined to documents or extends to brief testimony from a witness. In any event, *Bellamy* holds that the review standard is the substantial evidence standard with regard to the district court's findings of fact. I concede this certainly would be true if a live witness testified at the hearing.

At the full evidentiary hearing stage an appellate court reviews findings of fact for substantial evidence. 285 Kan. at 355. The majority applies this standard in reviewing the district court's ruling in our present case. I agree with the majority that the district court found issues that needed an evidentiary hearing. But here, at the evidentiary hearing, the

evidence consisted only of the motion, records, and files of the case. Further, it is noteworthy that the motion was not considered and decided by the judge who tried the case. Thus, it seems to me that the de novo review standard should apply because the district court was in no better position than we are in determining the facts.

"Hold on, pal!" I suspect the majority would say. "The court also had before it the deposition of Aguirre's trial counsel to consider." But the district court was considering the cold record without the witness being present in person when the court examined the deposition transcript. The district judge, who did not preside at trial, had no advantage over us when it came to deciding the facts.

Besides, I consider a deposition taken in a case to be a court record in the case. The cover of the deposition contains the caption of the case like any other document filed with the court. In the old days, depositions were routinely filed with the court at the time the transcript was prepared. With the explosion of pretrial discovery and the limited storage capacity of the clerk of the district court, it became the responsibility of the attorney taking the deposition to keep and protect a deposition until it was filed with the court. K.S.A. 2015 Supp. 60-230(f)(1). Then, when a deposition is used at a hearing it is to be filed with the court. K.S.A. 2015 Supp. 60-205(d). As such, it becomes part of the court record.

We have no hearing date identified in this case because the matter was submitted to the district court without a formal hearing. The deposition of Aguirre's counsel, which the district court was asked to consider, was filed and became part of the court record on December 23, 2014, well before the district court's rulings on Aguirre's motions the following summer. The only things before the district court when it decided this matter were the motions, records, and court files in the case. While the majority applies the letter of *Bellamy*, I believe the spirit and rationale of *Bellamy* would require us in this atypical situation to apply a de novo standard of review.

14